Jacob Markowitz, J.
The Attorney-General moves for a preliminary injunction to enjoin defendant from selling or offering for sale the stock of Cadman Towers, Inc. By the order to show cause, defendant was stayed from selling or offering the stock for sale pending the hearing of the motion.
The Cadman Towers project is a limited profit housing development to be located near the Brooklyn Civic Center. The project is under the jurisdiction of the Housing and Develop *418 ment Administration of the City of New York. Financing is being provided under the Mitchell-Lama program. It was first approved by the Board of Estimate on August 22, 1968.
Cadman Towers, Inc. submitted an “information bulletin” for filing to the Attorney-General on September 26, 1969. Defendant is the-owner of the land on which the project is being built. It is designated the “ Developer-Sponsor” of the project in the filed information bulletin. Its principal stockholder, Jack Fisher, is president of Cadman Towers, Inc. and one of its directors. Mr. Fisher’s wife is also a director and officer of Cadman Towers, Inc. The third director is the wife of the attorney who represents defendant and Cadman Towers, Inc. before the Housing and Development Administration. Hence, defendant is effectively the controlling factor in the implementation of the project.
The bulletin offered 16,007 shares of its class B capital stock to the public for $2,001,250. It was accepted for filing on October 11, 1969.
Inclusive of the estimated amount of the mortgage of $14,849,-000, the total estimated project cost was fixed at $16,850,250. The bulletin stated that, subject to change orders during construction approved by the Housing and Development Administration, the construction contract to be executed at or about the time of the mortgage closing would fix the maximum price to the contractor for construction of the development at $12,168,-000. No amended information bulletin has been filed since October 11, 1969.
Stock was sold to the public by Cadman Towers, Inc. until June 9, 1971. No stock has been offered for sale by Cadman Towers, Inc. since the end of August of 1971. The last substitution - of an accepted subscriber by another applicant approved by the Housing and Development Administration took place on September 2, 1971.
The core problem is that the construction contract actually executed (on October 31, 1969) did not substantially conform to the representation in the information bulletin filed with the Attorney-General; the construction cost was substantially greater than anticipated; the proposed mortgage has been increased by almost 40%; and the anticipated carrying charges will be correspondingly greater. Specifically, the construction contract actually executed was open-ended, not for a lump sum; the estimated construction price had grown by $3,600,000 by the fall of 1970; and the proposed mortgage was increased from $14,849,000 to $20,106,850 on February 10, 1972.
*419 The $3,600,000 increase in the cost of construction is obviously less than the final increase. Given the inflation in real estate costs since 1970, what the ultimate cost will be is impossible to estimate on the submitted papers. Yet this is the key to a forthright presentation to the public.
The picture presented by the information bulletin on file is distorted, and has been distorted for a considerable period of time. Yet, over $2,000,000 had been deposited by the subscribers to the Cadman Towers, Inc. stock under this bulletin.
The record before me points unmistakenly to the sponsor’s failure to make timely change in the information bulletin to the detriment of the public and to the subscribers to the Cadman Towers, Inc. stock. Equally pertinent, it points to subscriptions made by the public in reliance on the bulletin substantially after its inaccuracy should have become apparent to defendant, and the acceptance of these applications by the sponsor, despite such knowledge.
The Martin Act (General Business Law, art. 23-A) clearly grants the Attorney-General jurisdiction of the subject of this proceeding. The act is fundamentally remedial in character (People v. Federated Radio Corp., 244 N. Y. 33, 37-39). The words “ fraud ” and “ fraudulent practice ” as used in the act are given a wide meaning to include all deceitful practices contrary to the plain rules of common honesty (ibid.). Its purpose is to defeat any scheme whereby the public is exploited.
Good faith is not the issue (Matter of State of New York v. Interstate Tractor Trailer Training, 66 Misc 2d 678). All acts tending to deceive or mislead the public, whether or not the product of scienter or intent to defraud, come within its umbrella (People v. Smith Co., 230 App. Div. 268; People v. Hooker, 2 Misc 2d 874; People v. New York City Airport, 143 Misc. 472; see, also, People v. Royal Securities Corp., 5 Misc 2d 907; People v. Riley, 188 Misc. 969). The statute specifically imposes on the Attorney-General the duty to implement its objectives.
In its opposing affidavit defendant makes much of the supervision of Cadman Towers, Inc. by the Housing and Development Administration and argues that there is no need for action by the Attorney-General. The supervision of the Housing and Development Administration under the Private Housing Finance Law does not supersede the duties of the Attorney-General under the Martin Act. Each has his place; this offering to the public must meet the approval of both.
The Housing and Development Administration did not halt approving subscriptions for Cadman Towers, Inc. stock under *420 the filed information bulletin until after the investigation by the Attorney-General had commenced, almost two years after the bulletin had been filed with the Attorney-General and long after it became apparent that the bulletin had become obsolete and no longer viable. This was improvident.
The function of each agency is not a substitute for that of the other. In fact, this case substantiates the pragmatic basis for requiring the approval of the Attorney-General as well as that of the Housing and Development Administration.
The State is entitled to immediate and preliminary injunctive relief. Indeed the court is advised by the Housing and Development Administration that it has not approved any subscription for stock since August 30, 1971, and will not do so until a new offering circular is prepared by the sponsor under its supervision and is accepted for filing by the Attorney-General.
In an undated letter to the tenant co-operators of Cadman Towers, the Housing and Development Administration stated that the total carrying charge increase necessitated by reason of the mortgage increase would have approximated $13.25 per room per month ‘ ‘ had there not been any increase in the anticipated interest expense ”. However, the letter continued, the city’s borrowing costs were then approximately 7%, as against 5% in 1968, “and each additional point of interest requires additional revenue of $9.00 per room per month, or in this particular case approximately $18.00' per room per month from each tenant ”. Taken together, these increases totaled $31.25. The letter concluded that the new estimated carrying charges (inclusive of guard service to be provided [$1.25 per room per month] and increased maintenance and operating costs [$4.50 per room, per month]) would therefore be $82.60 per room per month.
In a second letter by the Housing and Development Administration to the tenant co-operators dated January 31, 1972, reference is made to decreases in the amount of the new mortgage requested of the Board of Estimate. Based on the amended request, estimated permanent carrying charges were reduced from $82:60 to $77.73 per rental room per month, exclusive of utilities. Crediting the reduction of $4.87 against the $31.25 mentioned above leaves a net estimated increase of $26.38 per room per month.
The end result of this anticipated increase of $26.38 per rental room per month is to change the fundamental character of the project. Premises renting for approximately $78 per room per month differ substantially from those renting for $51.35 per *421 room per month. Those who can afford to pay a rental of $51.35 per room per month are not necessarily able to pay $78 a month. So it is with this project. Despite their desire to move into the project, the subscribers are clamoring to be relieved of their commitments and for refund of their deposits, since they no longer can afford to do so.
Defendant will be enjoined until the entry of judgment from utilizing, when offering for sale the stock of Cadman Towers, Inc., the information bulletin on file, until it has been amended by defendant under the supervision of the Housing and Development Administration, and the amended bulletin has been approved by, and filed with, the Attorney-General.