Milton and Ellen **FORMAN** et al., Plaintiffs,

v.

**COMMUNITY SERVICES, INC.**, et al., Defendants.

No. 72 Civ. 3980.

United States District Court, S. D. New York.

Sept. 6, 1973.

George Berger, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiffs.

Martin London, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Community Services, Inc., United Housing Foundation, Harold Ostroff, Robert Szold, Milton Altman, George Schechter, Anthony Marino, Irving Alter, Julius Goldberg, and Paul Kramer.

Alan G. Blumberg, Szold, Brandwen, Meyers & Altman, New York City, for defendants Szold, Altman, Alter.

David Peck, Sullivan & Cromwell, New York City, for Riverbay Corp.

Louis J. Lefkowitz, Atty. Gen. of the State of New York by Daniel M. Cohen, Asst. Atty. Gen., New York City, for defendants State of New York and New York State Housing Finance Agency.

### OPINION AND ORDER

PIERCE, District Judge.

This action has been commenced by 57 residents of Co-op City,[1] a low-middle income cooperative housing project located in the Borough of the Bronx, New York City. They sue on behalf of themselves and all other residents of Co-op City, alleging, among other things, violations of the anti-fraud provisions of the Securities Exchange Act of 1934,[2] and of the Securities Act of 1933,[3] in connection with the sale to plaintiffs of shares of the common stock of the cooperative housing corporation.

The amended complaint also asserts violations of the plaintiffs' civil rights by one of the government defendants,[4] premised upon the protections afforded by the federal securities laws; and it further sets forth several claims, pendent to the federal claims, based on New York State law, including an asserted derivative cause of action on behalf of the cooperative corporation.

The corporate defendants constitute the amalgam which conceived, built, promoted and, at this time, controls the management of Co-op City. United Housing Foundation (UHF) initiated and sponsored the project.[5] UHF was organized under New York's nonprofit corporation statute [6] and is comprised of housing cooperatives, civic groups and labor unions. Community Services Inc. (CSI) is the general contractor and sales agent for the project. CSI was organized under New York's business corporation statute [7] and is a wholly owned

subsidiary of UHF. Riverbay Corporation (Riverbay) is the cooperative housing corporation in which plaintiffs purchased shares, and which owns and operates the project. Riverbay was organized by UHF as a "mutual company" under New York's Mitchell-Lama Act,[8] and is named as a defendant here only to facilitate the derivative aspects of the action.

The individual defendants are officers or directors, or both, of some, and in some cases all, of the corporate defendants.

Pursuant to the Mitchell-Lama Act, the defendant New York State Housing Finance Agency (the Agency) provided the bulk of the financing for the project through long-term, low-interest mortgage loans; and the defendant New York State Division of Housing and Community Renewal (the State Division) is responsible for the supervision of the development, construction, promotion and operation of the project.

The question before this Court, raised by defendants' motion to dismiss for lack of subject matter jurisdiction, is narrow, but dispositive: *Is a "share" of a state-financed and supervised, nonprofit cooperative housing corporation a "security" within the meaning of the federal securities laws?*[9] If so, plaintiffs are properly in federal court; if not, each of the alleged bases for federal jurisdiction must fail, and with them, the pendent state claims.

█ For the reasons set forth herein, this Court holds that the shares involved

---

1. Many are husbands and wives who own jointly their interest in a single apartment unit. Thus, altogether, there are occupants of 30 apartments named as plaintiffs.

2. 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5).

3. 15 U.S.C. § 77q(a).

4. 42 U.S.C. §§ 1983, 1988.

5. UHF was formed in 1951 with the primary purpose of fostering the growth of nonprofit cooperative housing for low and low-middle income families. In addition to Co-op City,

it has sponsored or participated in the sponsorship of more than eight other cooperative housing projects located in various boroughs of New York City.

6. N.Y. Not-For-Profit Corporation Law (McKinney's Consol.Laws, c. 4, 1962).

7. N.Y. Business Corporations Law (McKinney's Consol.Laws, c. 35, 1962).

8. N.Y. Private Housing Finance Law §§ 10–37 (McKinney's Consol.Laws, c. 44B, 1962).

9. Securities Exchange Act of 1934, 15 U.S.C. § 78c(10); Securities Act of 1933, 15 U.S.C. § 77b(1).

in this action are not "securities" within the meaning of the federal securities laws, and dismisses the complaint in its entirety pursuant to Fed.R.Civ.P. 12. Such ruling has no bearing on the merits of plaintiffs' grievances, which may well deserve to be fully aired in appropriate New York State forums.[10]

### Background

Co-op City is no ordinary enterprise. Reputed to be the largest cooperative housing development in the United States, the project was conceived in 1964, completed in 1972, and presently houses some 45,000 people. The complex is located on a 200-acre site, includes more than 30 high-rise buildings and more than 230 townhouses, which in total provide about 15,400 apartment units ranging from three to seven rooms.

The project was facilitated by New York's salutary Mitchell-Lama Act, the express purpose of which is to address critical housing problems in New York's urban areas by encouraging private enterprise to participate with the state and municipalities [11] in the creation of nonprofit housing cooperative undertakings for persons with low incomes.[12] Toward that goal, the Agency is empowered to provide low-interest financing through the issuance of loans secured by first mortgages on the projects;[13] and tax exemptions,[14] and certain other inducements are provided for corporate participants from the private sector.[15]

State regulation and supervision of the housing enterprises built under the Mitchell-Lama Act is mandated by law. The cooperative corporation cannot be created without the approval of the

10. Shares of cooperative housing corporations are "securities" within the meaning and protection of New York's anti-fraud laws. N.Y. General Business Law, § 352–e (McKinney Supp. 1972–73). *Cf.* People v. Cadplaz Sponsors, Inc., 69 Misc.2d 417, 330 N.Y.S.2d 430 (Sup.Ct.1972).

11. The New York State Legislature, as part of the policies and purposes of the Mitchell-Lama Act has declared that

[T]here exists in municipalities in this state a seriously inadequate supply of safe and sanitary dwelling . . . accommodations for families and persons of low income . . . that such conditions are due, in large measure, to overcrowding and concentration of the population, improper planning, excessive land coverage, lack of proper light, air and space, improper sanitary facilities and inadequate protection from fire hazards; that such conditions constitute an emergency and a grave menace to the health, safety, morals, welfare and comfort of citizens of this state, necessitating speedy relief which cannot readily be provided by the ordinary unaided operation of private enterprise and require that provisions be made by which private free enterprise may be encouraged to invest in companies regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing such housing facilities and other facilities incidental or appurtenant thereto for families or persons of low income . . . N.Y. Pri-

vate Housing Finance Law § 11 (McKinney Supp. 1972–73).

12. As part of additional policy and purposes of the Mitchell-Lama Act, the New York State Legislature has found that

[I]mprovement of the physical environment and revitalization of the quality of urban life . . . would be promoted by cooperative action by tenants who are persons or families of low income to acquire ownership of their dwellings and to operate them on a *nonprofit* basis; that such cooperative undertakings, with their consequent pride and responsibility of ownership, would . . . lead to the stabilization and renewal of deteriorating neighborhoods. N.Y. Private Housing Finance Law § 11–a(2–a) (McKinney Supp. 1972–73) (emphasis added).

13. N.Y. Private Housing Finance Law §§ 20, 22, 26, as amended, (McKinney Supp. 1972–73).

14. N.Y. Private Housing Finance Law § 33, as amended, (McKinney Supp. 1972–73).

15. For instance, the acquisition of the property for a housing project pursuant to the Act declared to be necessary for the public purpose, and a municipality may take property by condemnation for the cooperative company. N.Y. Private Housing Finance Law § 29, as amended, (McKinney Supp. 1972–73).

Commissioner of the State Division.[16] The statute mandates that no directors or subscribers to its stock may profit from the resale of such stock,[17] and provides that the tenant may not sublet at a price greater than approved by the Commissioner.[18] The statute requires the Commissioner's approval before the corporation can contract for operation of the project.[19] In fact, from the initiation of a project and continuing thereafter state control is pervasive.[20]

It is contemplated that a Mitchell-Lama cooperative project thus subsidized and supervised will be owned by a mutual company formed under the Act whose stock is held almost exclusively by persons who actually live in the project.[21] In accord with the purposes of the Act, the legislature has declared that no one may live in the project whose probable aggregate income exceeds six times the rental fees [22] and further, the legis-lature has indicated that preference shall go to the aged, the handicapped and to veterans.[23]

Thus by definition, the tenants of Co-op City are persons of limited, and in some cases, fixed incomes. They secured their right to occupancy by completing a Subscription Agreement and Apartment Application form, wherein they agreed to subscribe to 18 shares of Riverbay common stock—at $25 par value per share—for each room in the apartment they selected. After their applications were screened and accepted by the State Division, they signed a three-year, non-proprietary Occupancy Agreement (lease), paid for or financed the purchase of their stock, and moved in as the buildings were completed and their apartments were ready for occupancy.

Beyond the face value of $25 per share and the right to occupancy, the Riverbay shares carry little, if any inde-

---

16. N.Y. Private Housing Finance Law § 14 (McKinney 1962).

17. The statute requires that the certificate of incorporation for corporations such as Riverbay, shall state that

[T]he company has been organized to serve a public purpose and that it shall be and remain subject to the supervision and control of the commissioner . . . that all real and personal property acquired by it, and all structures erected or rehabilitated by it, shall be deemed to be acquired, rehabilitated or created for the proper effectuation of the purposes of this article, and that the directors and subscribers of such company shall be deemed to have agreed that they shall at no time receive or accept from such company in repayment of their investment in its stock any sums in excess of the par value of the stock . . .

N.Y. Private Housing Finance Law § 13(13), as amended (McKinney Supp. 1972–73).

18. N.Y. Private Housing Finance Law § 31(1)(a) (McKinney 1962).

19. N.Y. Private Housing Finance Law § 27(4)(d), (McKinney 1962).

20. The cooperative corporation cannot borrow or give security without the Commissioner's approval, N.Y. Private Housing Finance Law § 20(1) (McKinney 1962); its capital structure is dictated by law and subject to the Commissioner's approval, Id. § 21; the cooperative may not acquire real property, enter into any contract for construction or alteration of any real property, or sell any property, encumber or lease any real property, make any contracts for operation of the project, issue a guarantee of payment or enter into contracts for payment of salaries to officers or employees without the Commissioner's approval, Id. §§ 17, 27, 29. The Commissioner has the power to fix and to overrule the cooperative's rental structure, Id. § 31(1); to investigate all aspects of the affairs of the cooperative and its dealings with others, Id. § 32; and, in the event that the cooperative violates any provision of its certificate, or of law, or of the mortgage, or of any order of the Commissioner, the Commissioner has the power to remove all of the cooperative's directors and to replace them with his own designees, Id. § 13(15)(c), and to commence an action in the Supreme Court of New York for the purpose of having such violations stopped and prevented, Id. § 32(7), as amended, (McKinney Supp. 1972–73).

21. N.Y. Private Housing Finance Law § 12(2–b), as amended, (McKinney Supp. 1972–73).

22. N.Y. Private Housing Finance Law § 31(2)(a), (b), as amended, (McKinney Supp. 1972–73).

23. N.Y. Private Housing Finance Law §§ 11, 31(7)(a), (b), as amended, (McKinney Supp. 1972–73).

pendent value or meaning. The Riverbay By-Laws provide that they may not be pledged or otherwise encumbered; the shares may descend intact, with the right to occupancy, only to a surviving spouse. The stock transaction is rescindable by either party. The shares may not be owned separate and apart from actual occupancy in Co-op City, and a tenant who wishes to move out— or who is forced out for violation of the lease, or because his income has increased beyond income limits—is required to divest himself of the stock. He must first offer the shares to the cooperative corporation for repurchase, and the By-Laws provide that he will be compensated for these shares with exactly the amount he paid for them. In the unlikely event that the corporation does not repurchase the shares,[24] only then is he free to sell the shares elsewhere and then the Mitchell-Lama Act provides that he may not sell them for more than the original purchase price, plus a fraction of the mortgage amortization which he has paid during his tenure at Co-op City.[25] It is implicit in the By-Laws and the Act that he may not sell to a person who does not meet the income and credit requirements for occupancy. Voting rights in the affairs of the cooperative corporation are not tied to the number of shares owned, which could vary greatly according to apartment size. Rather, to facilitate the democratic cooperative ideal, each apartment is allotted one vote.[26]

The obligations of the Co-op City residents flow from the lease, not the stock. In addition to the usual landlord/tenant covenants with respect to services and care of the premises, the lease provides that the resident's financial commitment is to pay annual carrying charges, prorated in advance monthly payments. The apportionment is not based on the number of shares owned, but rather on other factors such as size, type and location of apartment. This monthly payment is, for all practical purposes, rent. It represents a proportionate allocation of all the expenses of Riverbay in connection with the construction, ownership, maintenance, operations and activities associated with the housing corporation. These include such items as taxes, mortgage indebtedness, repairs, improvements and wages for Riverbay employees.

---

24. Defendants have informed this Court that a reserve fund has been established for the repurchase of stock should drastic changes in economic conditions make it impossible to find buyers. The fund, as of December 31, 1972, totalled $917,338. Further, they say, Riverbay will exercise its option to repurchase the shares without tapping the reserve fund as long as there is a waiting list for Co-op City apartments. They have represented that there are approximately 7,000 families on the waiting list, and that the annual turnover is about 300 families.

In a supplemental affidavit filed September 4, 1973, plaintiffs have called this Court's attention to recent Riverbay advertisements in local newspapers, reopening the application list for two and three bedroom apartments. This indicates, they assert, that the waiting list consists of a disproportionate number of applications for one bedroom apartments and that the 7,000 figure submitted by defendants may be a distortion. Without characterizing the figure one way or another, it is clear from plaintiffs' submission that if the waiting list for certain types of apartments is growing short, then Riverbay is actively seeking to rebalance it in order to remain in a position to continue to exercise its option without using reserve funds.

25. N.Y. Private Housing Finance Law § 31–a (McKinney Supp. 1972–73).

26. At the present time, the control of Co-op City is still in the hands of the original amalgam which conceived and built it, and the tenant/shareholders do not as yet actually possess the stock certificates they have purchased, nor will they have any voting voice in the affairs of Riverbay until they do receive the certificates. Riverbay's Subscription Agreement and Apartment Application provides that the stock shall not be distributed until such time as the Commissioner of the State Division issues a Certificate of Acceptability after the completion of the project. The Division apparently has the Certificate under advisement and it will be issued shortly, assuming that the project is found by the State Division to meet its standards.

It is the amount of these carrying charges for Co-op City apartments which is the stress-point in this litigation.

In May of 1967, CSI as sales agent for Riverbay began promoting the sale of shares which carried with them the concomitant right to reside in Co-op City. Construction was then underway, but nowhere near completion. The Information Bulletin circulated through the mails to prospective tenant/stockholders set forth an estimated average monthly carrying charge of $23.02 per room. Thus, assuming he met the income eligibility requirements, the prospect for a three-room apartment could expect to pay about $1,350 for stock in Riverbay and a monthly rent thereafter of $69.06. Persons familiar with the cost of housing in New York City can appreciate the incredible bargain Co-op City must have seemed to prospective tenant/stockholders. However, by the time the project was near completion, the bargain had somewhat diminished. In 1968, while the project was still under construction, the Information Bulletin estimate was revised to $25 per room, per month. Then in an unremitting upward spiral, the estimate was revised to $29.39 for 1970–72; to $35.27 for 1973–74; and it is now estimated that the charge will be $39.68 effective July 1, 1974. Thus, the $69.06 monthly rental bargain for a three-room apartment will soon cost $119.04 a month.[27] At the same time, of course,

the maximum income eligibility limit, related as it is to carrying charges, has increased proportionately; and it may be assumed that to the extent the increases in carrying charges reflect the inflationary trend of the period, wages and salaries should have also risen proportionately. Thus, for tenants in the work force, it is possible that no real hardship has occurred.

But all of this is of little solace to the elderly and the handicapped, or anyone on a fixed or sluggish income, or indeed, anyone who arranged his affairs based on a belief that the earlier Co-op City estimates would remain unaffected by changes in the economy. The gravamen of the plaintiffs' complaint is that this is precisely what they were led to believe by misrepresentations and material omissions in the Information Bulletins. They point to the earliest Bulletin which indicated that there was a "lump sum" price of $258,678,000 fixed for the construction of the project, to be financed with a $250,000,000 mortgage from the Agency. The bulletin further stated that "the risk of completing the construction within the lump sum price is on the contractor." The final construction bill for Co-op City was $340,500,000, and the tenant/stockholders absorbed the impact, chiefly through a $125,000,000 increase in the mortgage loan from the Agency which consequently contributed greatly to the increase in carrying charges.[28] In addition to this alleged misrepresentation, plaintiffs as-

27. Relatively speaking, Co-op City still offers one of the lowest rent structures of any Mitchell-Lama housing in New York City. This is due, at least in great part, to its low unit construction cost of $19,000 compared with the present Mitchell-Lama average of $40,000 per unit. In a case with similar underlying facts, commenced in the New York State courts, the estimated average monthly carrying charges had jumped from $51.35 per room in 1968 when the project was commenced, to $82.60 per room. People v. Cadplaz Sponsors, Inc., *supra*, note 10. It may be worth noting that the sponsors in that case were acquitted of criminal fraud charges in connection with the offering of stock in the cooperative corporation. N.Y. Times, July 10, 1973, p. 1, col. 1.

28. Because of the procedural posture of the litigation the defendants have not as yet developed fully their side of the merits. However, it is well to point out here that other language in the Information Bulletins states that the lump sum price is subject to addition or deduction for change orders during the progress of the construction. Also, the Information Bulletins warn that "it is possible that increases in costs may increase the average monthly carrying charge somewhat above the [estimate]." Further, defendants argue that even if plaintiffs were misled, there could be no damages because under Riverbay By-Laws the tenant may withdraw from occupancy at any time and receive his stock purchase price back in full.

sert that a number of other material facts were omitted from the Information Bulletins, all of which would have influenced their decision to purchase or not to purchase shares in the cooperative corporation.

Since this Court is not called upon to rule on the merits here, and particularly in view of the conclusion this Court reaches as to this motion to dismiss, further detail with respect to the plaintiffs' specific charges or the defendants' answers would serve little purpose. But the Court is constrained to say that if ever there was a group of people who need and deserve full and careful disclosure in connection with proposals for the use of their funds, it is this type of group. By law, they would not be eligible for occupancy in Co-op City unless their financial resources were limited. The housing selection decision is a critical one in their lives. The cost of housing demands a good percentage of their incomes. Their savings are most likely to be minimal, and they probably don't have lawyers or accountants to guide them. Further, they are people likely to put a great deal of credence in statements made with respect to an offering by reputable civic groups and labor unions, particularly when the proposal is stamped with the imprimatur of the state.

However, the question before this Court is not whether the plaintiffs *should* be protected; rather, the question is whether or not they *are* protected by the federal securities laws.

### The Legal Principles

Any analysis of this issue must begin with the language of the statutes which define the scope of the federal securities laws.

Section 3(a)(1) of the Securities Exchange Act of 1934 provides:

29. 15 U.S.C. § 78c(10).

30. Tcherepnin v. Knight, 389 U.S. 332, 335–336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). See, S.Rep. 792, 73d Cong., 2d Sess. 14 (1934).

3. (a) When used in this title, unless the context otherwise requires—(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.[29]

The Securities Act of 1933 contains a definition of a "security" almost identical to that contained in the 1934 Act, and the Supreme Court has indicated that the definitions under either Act are, for these purposes, interchangeable.[30]

Beyond the bare itemization contained in each definitional section, the statutes themselves yield little in the way of elaboration as to the characteristics of an instrument intended to be covered by the securities acts. Legislative history directly to the point is sparse and somewhat circular, confirming, for instance, that the definitional sections define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of security."[31]

31. H.R.Rep.No.85, 73d Cong., 1st Sess. 11 (1933).

However, there is a landmark Supreme Court case which sets forth a number of principles and tests which light this Court's way. The Court in S.E.C. v. Joiner Corp., 320 U.S. 344, 64 S. Ct. 120, 88 L.Ed. 88 (1943), did not attempt to rigidly classify the oil leases at issue there, rather it stated that the courts should construe the legislation in conformity with its dominating general purposes, *Id.* at 350–351, 64 S.Ct. 120 and decide whether these documents had the evils inherent in the securities transactions which it was the aim of the Securities Act to end. *Id.* at 349, 64 S.Ct. 120. Then, the Court went on to explain the definitional sections:

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a "security." . . . Instruments may be included within any of these defintions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security.'" *Id.* at 351, 64 S.Ct. at 124.

The Court then stated that the "test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution and the economic inducements held out to the prospect", *Id.* at 352–353, 64 S.Ct. at 124, noting that while in some cases a document might be proved a security by proving the document itself, "[i]n others proof must go outside the instrument itself. . . ." *Id.* at 355, 64 S. Ct. at 125.

In a later case, S.E.C. v. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) the Court stated explicitly what was implicit in *Joiner,* that in searching for the meaning and scope of the word "security" in the securities laws, form should be disregarded for substance and the emphasis should be on economic reality. *Id.* at 298, 66 S.Ct. 1100. See also, Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L. Ed.2d 564 (1967).

### The Riverbay Shares

What this means in the context of the Riverbay shares is that this Court must first determine whether or not the identifying characteristics of the Riverbay instruments, and the economic realities of the Riverbay transaction—the plan of distribution and the economic inducements held out to the prospective purchasers—fit any of the items set forth in the statute; and, if not, then determine if Congress intended, nonetheless, to cover this type of transaction.

Plaintiffs urge, in one branch of their argument, that inasmuch as "stock" is explicitly set forth as a "security" in the plain language of the statute, and the instruments purchased by the residents of Co-op City are called "shares of stock," they are, *a fortiori,* securities. They rely on the language set forth in S.E.C. v. Joiner Corp., *supra,* 320 U.S. at 351, 64 S.Ct. 120, where the Court notes that some instruments may be included as a matter of law if they answer to the name or description of a category in the securities law. Plaintiffs also cite the alternate holding in Tcherepnin v. Knight, *supra,* 389 U.S. at 339, 88 S.Ct. 548, which relies on the *Joiner* language to point out that the investment contract in *Tcherepnin* could

have also qualified as "stock." This Court believes that a reading of the entire paragraph from *Joiner,* set forth in full, *supra,* along with the *Howey* refinement, makes it clear that this Court must, at a minimum, look through the name of an instrument to its essential characteristics and determine whether it fits the standardized, well-settled meaning of "stock." This is, in fact, what the Court did in *Tcherepnin,* and only after noting that the instrument was evidenced by a certificate and that payment of dividends were contingent upon an apportionment of profits did it identify the instrument as a "stock." Accepting the definition set forth in *Tcherepnin* as the well-settled meaning, it is clear that Riverbay shares do not fit because they do not represent any right to any apportionment of tangible profits.[32] Therefore, this Court rejects plaintiffs' argument.[33]

The Court in *Joiner* indicated that in cases where the instrument could not be proved a security on its face, "proof must go outside the instrument itself. . . ." S.E.C. v. Joiner Corp., *supra,* 320 U.S. at 355, at 125

of 64 S.Ct. Since this is the case here, the next area of inquiry is into the substance of the transaction. It is to this area that the bulk of the arguments are directed.

Defendants urge first that the severe restrictions surrounding the owner's use of the stock are such that the shares fit none of the categories of instruments or transactions which Congress intended to be covered by the securities laws. Further they argue that the nonprofit economic realities surrounding it, and the public policy underlying it, coalesce to produce a unique transaction, far removed from the commercial world that Congress intended to regulate with the federal securities laws.

Plaintiffs contend that this Court, by applying some flexibility, could find that the major motivation for the purchase of Riverbay shares is the economic benefit to be gained and that such creates a securities transaction, if not as stock *qua* stock, then in some other form. Further they argue that the major thrust of Congress was to protect the investor and that it makes little difference whether or not the enterprise

---

32. Plaintiffs also cite Movielab, Inc. v. Berkey Photo, Inc., 321 F.Supp. 806 (S.D.N.Y. 1970), aff'd, 452 F.2d 662 (2d Cir. 1971), where the district court, relying on the "plain meaning" principle of statutory interpretation, felt compelled to follow the "unequivocable and all embracing" statutory language that "[t]he term 'security' means any note . . . . ." The Court of Appeals in affirming did not indicate that it felt bound by the name on the documents alone, but noted that the statutory language included "some notes at the very least" and held that the facts there presented brought those particular notes within ambit of the securities acts. Thus, with respect to the Riverbay "stocks" it is clear that the statutory language includes some "stock", but on these facts, not necessarily these "stocks." This Court has considered the decision in Stockton v. Lucas, 482 F.2d 979 (Em.App. 1973) wherein that court held that for purposes of the exemption from Phase I price controls, a share in a private New York City cooperative housing corporation was a "stock" within the definition developed under New York case law. That holding is not dispositive of the issue with respect to Riv-

erbay shares, for two reasons. First, federal law must govern on the question of whether shares constitute securities under the federal securities laws. Tcherepnin v. Knight, *supra,* 389 U.S. at 337–338, 88 S. Ct. 548. And second, the shares in *Stockton* were those of a private cooperative corporation, the shareholder had the right to retain the "stock" upon moving out, and thus the shares did, in fact, represent a right to the apportionment of the profits and the assets of the corporation.

33. The Court also rejects the defendants' argument that even if the plaintiffs' theory is valid, the "stock" in this case is not covered by the statute because the plaintiffs do not yet possess the certificates and, until the Commissioner of the State Division issues a Certificate of Acceptability, they are deemed to be neither stockholders or holders of any other equity obligation of the cooperative corporation. This is erroneous. The tenants of Co-op City have purchased, at the least, the right to own these shares, and that is enough under the statute, providing all other tests are met. 15 U.S.C. § 78c(a)(13).

which induces him to part with his money is commercial or nonprofit.

For all the arguments set forth by both plaintiffs and defendants—technical, substantive, emotional, policy—it is well to note at the outset of this inquiry that it is the fundamental nonprofit nature of this transaction which in this Court's view is the insurmountable barrier to plaintiffs' claims in this federal court.[34]

 Plaintiffs attempt to overcome this hurdle by tacitly recognizing that if the Riverbay transaction is a securities transaction at all, it is more likely to be an investment contract than any other. An investment contract is one of the few items on the statutory list which has a developed definition. The oft-cited test enunciated in S.E.C. v. Howey Co., *supra*, has been used in a line of Supreme Court cases finding that such a contract does exist. See S.E.C. v. Variable Annuity Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); S.E.C. v. United Benefit Life Ins. Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967); Tcherepnin v. Knight, *supra*. The *Howey* definition of an investment contract contains three elements. First, there

must be a transaction whereby a person invests his money in a common enterprise; second, he must invest with the expectation of profits; and third, the profits must come solely from the efforts of the promoter or a third party. S.E.C. v. Howey Co., *supra*, 328 U.S. at 298–299, 66 S.Ct. 1100.

With respect to the Riverbay shares there can be no serious argument as to the first and last requirements. The first, a common enterprise, is self-evident because the corporation is a cooperative. The third could be questioned in a small cooperative where the ideal of joint venture was a reality, but given the massive size of Co-op City it would be specious to argue that the cooperative ideal precludes the notion of management by third parties. Furthermore, the By-Laws of Riverbay clearly vest absolute control in the hands of the promotors until the tenants receive their stock certificates. These have not yet been distributed, see note 33. Thus, at this time, the third element of the *Howey* test is met in fact, as well as in spirit.

It is on the second element—the expectation of profit—where plaintiffs' argument founders. *Joiner* instructs that

---

34. The remainder of defendants' arguments may carry some weight in the aggregate, but are not persuasive or dispositive standing alone. It makes little difference whether or not the purchasers' motive could be said to be speculative. Tcherepnin v. Knight, *supra*, 389 U.S. at 345, 88 S.Ct. 548; S. E. C. v. Howey, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Nor is it dispositive that the shareholder is severely limited in his dealings with his shares, or that he must first offer them back to the cooperative. *Cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Collins v. Rukin, 342 F.Supp. 1282 (D.Mass.1972). Federal securities regulation is not precluded just because the enterprise is regulated by state or other federal law. *Cf.* S. E. C. v. Variable Annuity Co., 359 U.S. 65, 75, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); S. E. C. v. United Benefit Life Ins. Co., 387 U.S. 202, 210, 87 S.Ct. 1557, 18 L. Ed.2d 673 (1967); S. E. C. v. Lake Havasu Estates, 340 F.Supp. 1318, 1322–1323 (D. Minn.1972). Nor is it dispositive that the shareholder can, at his option, withdraw from the transaction and receive back his

original investment, or that the value of the shares does not fluctuate. Tcherepnin v. Knight, *supra*, 389 U.S. at 345, 88 S.Ct. 548. Nor does the fact that the shareholder is not given certain rights normally attributed to his status, such as proportionate voting rights, determine the final result. *Cf.* Tcherepnin v. Knight, *supra* at 344, 88 S.Ct. 548.

And finally, this Court sees little value in engaging in the argument as to whether the right to occupancy is an incident of stock ownership, or whether the ownership of these shares is incident to the right to occupancy. Although it is clear that the securities laws do not extend to the classic purchase of real estate, this is so because the transaction does not meet the full test developed to identify a stock or an investment contract, not because the underlying property is real rather than personal. S. E. C. v. Joiner Corp., 320 U.S. 344, 352, 64 S.Ct. 120, 88 L.Ed. 88 (1943); Roe v. United States, 287 F.2d 435, 437–438 (5th Cir.), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L. Ed.2d 29 (1961).

this Court should look to the economic inducement offered by the promotor; *Howey* instructs that this Court should look go the expectation of the purchaser for profits. This Court has examined both and finds that none of the documents involved in this transaction—the Information Bulletins, the Subscription Agreement and Apartment Application, or the Occupancy Agreement—ever, once use material, tangible profits as an inducement.[35] In fact, the Information Bulletins assert the contrary, impressing upon the potential purchaser the stability of environment to be achieved because the shares can not be used for speculation.[36] They also point out that a departing tenant is required to resell his shares to the corporation for no more and no less than the purchase price, thus assuring no gain and no loss.[37] Further, since these shares pay no dividends, contemplate no apportionment of any profits or assets or earnings of any kind, it is clear that the Co-op City residents did not purchase the

shares with any expectation of profits, as the word is generally used in commerce. These shares are incapable—by law and by-law—of producing any monetary or fungible return. It would go against the fundamental purpose of the cooperative ideal and the Mitchell-Lama Act if it were otherwise.[38] And, the state law is replete with provisions to guard against the possibility of profits from these shares or from occupancy in Co-op City.[39] Finally, of course, because both the cooperative corporation, Riverbay, and its sponsor UHF, are organized on nonprofit structures, there could be no monetary gain from the operations of the corporations to distribute, even if it were allowed by law.

Plaintiffs, fully cognizant of the legal problem, advance two bases upon which this Court might find the "profit" element satisfied in this transaction.[40] First, they suggest that this Court follow Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361

35. The only conceivable tangible benefit mentioned is the possibility of city, state and federal tax deductions available as a result of the tenants' payment of real estate taxes through their carrying charges. To the extent that this can be characterized as economic inducement, it suffices to note that it is an incident of real estate ownership, not securities ownership. See Eckstein v. United States, 452 F.2d 1036 (Ct.Cl.1971).

36. The Information Bulletins stress the nonprofit nature of the enterprise and the corporations sponsoring it. The advantages of cooperative organizations are· set forth, in part, in the following terms:

"[I]t is a way to obtain decent housing at a reasonable price" . . . "[It is] designed to provide · a favorable environment for family and community living" . . . "[It avoids the problems of private apartment dwelling] where the landlord's interest was financial gain" . . . "Living in a cooperative is like living in a small town. As a rule there is very little turnover in a cooperative." "It is being a part of a group working for common purposes to benefit all."

37. The Information Bulletin recognized that "the investment a person makes in a cooper-

ative often represents a large share of his life savings. To insure the investment against a time when there might not be an applicant for the apartment a special reserve will be established."

38. The beneficial purposes of the Mitchell-Lama Act would be ill-served if a tenant whom the State Division has screened for income and credit stability was to be free to transfer his stock and its inherent right to reside in Co-op City to the highest bidder, or could in other ways manipulate his interest to produce a personal profit. See notes 11–12, *supra.*

39. See notes 15–25.

40. Plaintiffs put forth a third basis which relies on the remote possibility that there will come a time when the reserve fund (see note 24) may be depleted, and the divesting stockholder would be free to dispose of his shares on the open market, presumably at the small profit allowed by the Mitchell-Lama Act (see note 25). This Court does not find this remote possibility enough to establish a profit motive in the purchase of the Riverbay shares. Even if it should occur, the amount of profit allowed by the legislature is de minimis.

P.2d 906 (1961) and read the tangible profit motive out of the *Howey* test.[41]

The *Silver Hills* case has come to stand for the theory that the requisite profit motive should be replaced with a "risk capital" approach which holds that the investor is protected by the securities laws if he risks capital, whether or not he expects a monetary return on the capital. In *Silver Hills* the risk was for a lifetime membership in a country club, but it was a large risk in a shaky enterprise devoted to making a profit. Given the pervasive state support and supervision of Riverbay in the transaction at issue here, and the resultant zero capital risk because of the guarantee of a complete refund on the stock purchase price, and the essentially nonprofit nature of the enterprise, this would not seem to be the case for the first federal application of this California state securities theory.

Alternatively, plaintiffs suggest that even though no monetary profit was envisioned or possible from the Riverbay shares, the shares were sold and purchased with economic benefits in mind. They ask this Court to expand the definition of "profit" to include savings of money that might have otherwise gone for more expensive housing; or the social gain to be had in quality housing for minimal expense. Put another way, the profit expected by Co-op City residents was the invaluable hedge against the skyrocketing real estate market in New York City.

 This argument is most appealing to this Court, particularly when made on behalf of people with limited incomes who are not free economically to allocate a portion of their money to ordinary capital producing securities, however safe, and who are not in a position to risk their money in speculative schemes. But, of the few cases which counsel and this Court have managed to find where this concept of profit was a possible factor, only one on close analysis is near the point.[42] And its point,

---

41. Several commentators would be in accord. See Anderson, Cooperative Apartments in Florida: A Legal Analysis, 12 Miami L.Rev. 13 (1957); Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla.L.Rev. 135 (1971); Zammit, Securities Law Aspects of Cooperative Housing, N.Y.L.J., Jan. 8, 1973, p. 1, col. 1; Note, Cooperative Housing Corporations and Federal Securities Laws, 71 Colum.L.Rev. 118 (1971); Note, The Economic Realities of a "Security": Is There a More Meaningful Formula, 18 Case W.Res. L.Rev. 367 (1967); Note, Cooperative Apartment Housing, 61 Harv.L.Rev. 1407 (1948); Comment, Sobieski, Securities Regulation in California: Recent Developments, 11 U.S.C.A.L.Rev. 1 (1963). But see, Miller, Cooperative Apartments: Real Estate or Securities, 45 Boston U.L.Rev. 465 (1965).

42. Neither side has been able to cite to this Court any federal cases directly concerned with the narrow issue presented here. Plaintiffs have called this Court's attention to Davenport v. United States, 260 F.2d 591 (9th Cir. 1958), cert. denied, 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959), a criminal case where the court apparently accepted as a security, a share in an employment cooperative. But, the issue was not discussed or even raised in that case and this Court does not consider it authority on the question. This Court has found one other federal case, where the motivation of the purchaser was discussed in non-monetary terms. In S. E. C. v. American Foundation for Advanced Education of Arkansas, 222 F.Supp. 828 (W.D.La.1963), the transaction involved an annuity type scheme for a future education fund. The Court there said

. . . the universal desire of parents to secure the advantages of higher education for their children and to offset whenever possible the increasing cost of such education, makes the application of the securities act emphatically necessary here. Id. at 831.

However, in spite of the court's language, the substance of the transaction promised the purchaser $6,000 worth of future education for a $1,000 investment. Thus underlying the decision was a monetary inducement and expectation.

Plaintiffs have cited, as authority for their position, Ashton v. Thornley Realty Co., 346 F.Supp. 1294 (S.D.N.Y.1972), aff'd without opinion, 471 F.2d 647 (2d Cir. 1973). There the district court granted summary judgment to a private cooperative corporation on a securities fraud complaint, implicitly accepting the stock involved as "securities," although the question was never raised or discussed. Whether or not this case stands for some authority on the general issue of the stock of a cooperative housing corporation as a

with respect to a medical cooperative, was simply, "money saved is money earned." State ex rel. Troy v. Lumberman's Clinic, 186 Wash. 384, 58 P.2d 812, 816 (1936). As attractive as that reasoning may be, Supreme Court cases and the lower federal court cases which follow them closely, and legislative documents concerning the federal securities laws convince this Court that the weight of authority is against it. This Court has attempted to follow the guiding principle that federal securities laws, as remedial legislation, must be read liberally to effectuate the purpose of Congress. Tcherepnin v. Knight, *supra,* 389 U.S. at 336, 88 S.Ct. 548, and is mindful that to further the objectives of Congress, the securities laws must be viewed as embodying a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits. S.E.C. v. Howey Co., *supra,* 328 U.S. at 299, 66 S.Ct. 1100. Yet, it seems certain that Congress never intended to stretch the scope of the securities acts outside the commercial world and its fungible valuables, to the uncharted and unchartable realm of intangible, elusive personal values where one man's balm may very well be another's bane.

The legislative history of these acts, on the contrary, indicates that the intentions of Congress were focused on the powerful inducement of cold, hard cash and anything which could be converted to it through the commercial ingenuity of man. It is the abuse of this inducement, this motive, from which Congress believed investors needed protection, both for their well-being and for the health of the nation's commercial enterprises and its economy.[43]

---

"security," it is clear from the facts that it was not a state-supported and supervised nonprofit corporation and that the possibility of monetary profit from sale of its stock was great. Therefore, it is not pertinent to the issues raised by the Riverbay stock.

Beyond these cases, every case cited by counsel for either side have involved only the general proposition that this Court should look through form to substance. In each there was no question but that the inducement was a monetary return; and in most the issue was the third-prong of the *Howey* test which is not at issue here. Therefore these cases are not helpful to determination of the specific question before this Court.

43. This conclusion is based on the historical context of the legislation as a whole, but selected excerpts from Congressional documents serve to illustrate the point.

The House report on the Securities Act of 1933, describing the conditions which had precipitated the legislation, called attention to the "[a]lluring promises of *easy wealth* [which] were freely made with little or no attempt to bring to the investors' attention those facts essential to estimating the worth of any security." Then, referring to abuses in the real estate development field, the report condemned the ". . . creation of false and unbalanced values for properties whose *earnings* cannot conceivably support them." H.R.Rep.No.85, 73d Cong., 1st Sess. 2 (1933) (emphasis added). The report defines "securities" as the many types of instruments that *"in our commercial world"* fall with the ordinary concept of security. *Id.* at 11 (emphasis added).

The House report on Securities Exchange Act of 1934, states that

The fundamental fact behind the necessity for this bill is that the *leaders of private business* . . . have not . . . been able to protect themselves by compelling a continuous and orderly program of *change in methods and standards of doing business* to match the degree to which the economic system has itself been constantly changing . . . changing in the proportion of the *wealth of the Nation invested in liquid corporate securities* . . .

H.R.Rep.No.1383, 73d Cong., 2d Sess. 3 (1934). (emphasis added).

And the report continues with a discussion of the need for the legislation in terms of protecting the investor, increasing his confidence and thereby protecting the economy, and states that

. . . *easy liquidity of the resources in which wealth is invested* is a danger rather than a prop to the stability of [the economic] system. *When everything everyone owns can be sold at once*, there must be confidence not to sell. . . . [A]s it becomes more liquid and complicated an economic system must become more moderate, more honest and more justifiably self-trusting.

*Id.* at 5 (emphasis added).

Congress did not intend to sweep into the ambit of the federal securities laws, state-encouraged, nonprofit transactions made pursuant to a state emergency housing law and available only to state residents. And the mere fact that the state legislature chose to provide a form of organization common to the commercial world, in order to achieve critical public welfare goals, does not change that basic finding.[44] Clearly, the beneficiaries of the state legislation should be protected from abuses, but it is this Court's view that in this instance, such protection must come from the state.

It is the plaintiffs' affirmative burden to show that their action has been properly brought in federal court. They have not met that burden with respect to this Court's jurisdiction under the federal securities laws. There being no other basis for federal jurisdiction, the counts of the amended complaint alleging violations of the federal securities laws are dismissed as to all defendants named therein. Further, since the federal securities allegations represent the only well-pleaded underlying basis for jurisdiction under the Civil Rights Act, count nine is dismissed as against the Agency. The remaining counts are dismissed as against the defendants named therein, inasmuch as they set forth pendent claims asserted pursuant to state law. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The complaint is therefore dismissed in its entirety for lack of subject matter jurisdiction.

So ordered.

---

44. It must be acknowledged that the exemptions from the registration provisions for charitable organizations in the 1933 Act, 15 U.S.C. § 77c(4), and the 1934 Act, 15 U.S.C. § 78*l*(g)(2)(D), plus the exemption for some cooperative associations in the latter, 15 U.S.C. § 78*l*(g)(2)(E), (F), give some indication that Congress did not entirely ignore beneficial, nonprofit purposes in drafting the laws. However, the import of these exemptions is equivocal. It is settled that an exemption does not mean that the instrument or transaction or organization is exempt from the anti-fraud provisions of the Acts. 15 U.S.C. § 77q(c); Tcherepnin v. Knight, *supra*, 389 U.S. at 342, 88 S.Ct. 548. But it is far from settled that a mere exemption indicates that Congress intended all instruments of the organizations exempted to be "securities" within the meaning of the Acts. Although the shares of a cooperative housing corporation are not included within the terms of any of these exemptions, plaintiffs attempt to make this technical argument, citing a Securities Exchange Commission (S.E.C.) Rule which does specifically exempt stock or other securities representing membership in any cooperative housing corporation with certain limiting provisos. Rule 235, 17 C.F.R. § 230.235.

Professor Loss characterizes this as "too facile" an argument. 1 Loss, Securities Regulation, 493–94 (1961). This Court agrees, given the vagaries of political and social pressures likely to work upon a legislative body drafting regulatory acts such as this. See, e. g., H.R.Rep.No.1418, 88th Cong., 2d Sess. 11 (1964), wherein it is indicated that the cooperative association exemption was included at the behest of rural electrification cooperatives. See also, Hearings on H.R. 6789, H.R. 6793, S. 1642. Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 88th Cong., 1st & 2d Sess., pt. 2, at 855–65 (1963–64).

Furthermore, this Court is, of course, not bound by any administrative determination of what is or is not a security, particularly when the Rule in question has never been tested in the courts and, as nearly as this Court can determine, has not been rigidly enforced by the S. E. C. See, Zammit, Securities Law Aspects of Cooperative Housing, *supra*. Finally, a recent release indicates that the S. E. C. itself has refined its thinking and is now seeking to narrow its interpretation of the scope of the securities acts to those housing enterprises where all three-prongs of the *Howey* test are present. S.E.C. Release # 5347, Jan. 4, 1973, Fed. Sec.L.Rep. ¶ 79, 163 (Trans.Binder 1972–73).