Sidney A. Fine, J.
Motions under Calendar numbers 85 and 90 of May 15, 1975 and 44 of July 25, 1975 are consolidated for disposition.
Plaintiff Cadplaz Sponsors, Inc., developer sponsor of defendant Cadman Towers, Inc., a co-operative housing company formed pursuant to article II of the Private Housing . Finance Law (Mitchell-Lama Law), brings this action to recover certain reimbursable "land allowance” costs and development fees claimed to be due it as consideration for its role as developer of Cadman Towers, a co-operative housing project located at Cadman Plaza in Brooklyn. Plaintiff also seeks indemnification by the individual defendants, who are directors of Cad-man Towers appointed by the Housing and Development Administration (HDA), for any portion of its claim which may be uncollectible from the housing company. Additionally plaintiff has moved for a preliminary injunction enjoining the individual defendants from continuing to exercise management powers on behalf of Cadman Towers.
Plaintiff sponsor acquired the building site from the City of New York in 1963, which in turn had acquired it by condemnation for urban renewal purposes. Under the initial agree *963 ment, plaintiff was to construct a development financed by a mortgage insured under section 213 of the National Housing Act (US Code, tit 12, § 1715e; 64 US Stat 54, as amd). For reasons unexplained, the sponsor was unable to obtain such a Federal mortgage, and in March, 1969, it organized defendant Cadman Towers, Inc., as a limited profit housing company, to own, construct, and operate a municipally aided co-operative project for low- and middle-income housing (Private Housing Finance Law, §§ 11, 13). The total cost of the project was originally estimated at $16,850,250, to be financed by a Mitchell-Lama mortgage from the city in the amount of $14,849,000, and the sale of subscriptions to shares of class B stock to tenant co-operators in the amount of $2,001,250.
Plaintiff installed three nominees as incorporator directors and class A shareholders of the co-operative. These nominees, possessing the entire voting power of the housing company, were to assume all managerial functions until approval of a “Certificate of Final Acceptance” of the development by the Housing and Development Administration. By statute, the HDA, as "supervising agency”, has exclusive power to regulate the operations of Mitchell-Lama housing companies (Private Housing Finance Law, § 23). Upon final acceptance of the development by the HDA, the nominees were to return their shares to the corporation and class B shares would then issue to the tenant stockholders. No such approval has been obtained to date.
At the time Cadman Towers, Inc., took title to the building site, plaintiff admittedly received the sum of $2,550,200 as consideration for the sale of the land. The housing company, as noted, then under the control of plaintiffs nominees, prepared an information bulletin as an offering statement for prospective co-operators. The bulletin, filed with the Attorney-General, fixed a maximum price for construction of the development and stated that the risk of completing construction within that limit was upon the contractor. But in fact, the construction contract (approved by the HDA) actually executed was open-ended and permitted the contractor to pass along additional costs for "change orders” to the co-operative. Consequently, the housing company was eventually obliged to request and did receive an increase in the mortgage loan to $20,106,850, an increase of over five million dollars. By reason of the mortgage increase, substantial increases were forecast in the proposed monthly carrying charges to be borne by *964 tenant co-operators in the project, causing many to demand rescission. In March, 1972, this court, in a proceeding brought by the Attorney-General, granted a temporary injunction prohibiting further sales by the. sponsor until the information bulletin had been amended under the supervision of the HDA and the amended bulletin had been approved and filed with the Attorney-General (People v Cadplaz Sponsors, 69 Misc 2d 417). In that proceeding, this court observed (p 419) that the record "points to subscriptions made by the public in reliance on the bulletin substantially after its inaccuracy should have become apparent to defendant [the plaintiff herein], and the acceptance of these applications by the sponsor, despite such knowledge”.
Thereafter, criminal proceedings were instituted against the plaintiff in Kings County on 86 counts of grand larceny and violations of section 352 of the General Business Law. The trial court found the sponsor not guilty, commenting that "while guilt beyond a reasonable doubt has not been proven, this whole matter is not exactly a model of forthright dealing with the public” (People v Cadplaz Sponsors, NYLJ, July 11, 1973, p 14, col 3).
Upon the plaintiff’s indictment in June, 1972 in the criminal action, the administrator of HDA, acting pursuant to statutory authority (Private Housing Finance Law, § 32, subd 6), removed the three directors of the housing company nominated by plaintiff and appointed three HDA employees to the board in their stead. These appointees assumed full control of the co-operative’s management, renegotiated the construction contract, revised the information bulletin, and resold approximately 50% of the apartments originally sold by the sponsor but later rescinded by the initial purchasers because of the increased maintenance charges.
In June, 1974, plaintiff notified the HDA that the class A shareholders (plaintiff’s original nominees) intended to meet and elect directors of the corporation. Such meeting was held on July 8, 1974, subsequent to the commencement of this action, and resulted in the re-election to the board of the very directors previously displaced by the HDA. Plaintiff moves for a preliminary injunction restraining the HDA directors or "holdovers” from continuing to exercise the management powers of the co-operative, and directing them to turn over the books and records to plaintiff, the "duly elected management.”
*965 Subdivision 6 of section 32 of the Private Housing Finance Law (embodied in article XV of Cadman Towers’ certificate of incorporation) provides, in pertinent part, as follows: "In the event of a violation by a company of a provision of the certificate of incorporation or of law or of the loan or mortgage contract or of any rules and regulations duly promulgated pursuant to the provisions of this article, * * * the supervising agency * * * may remove any or all of the existing directors of the company and appoint such person or persons who * * * the supervising agency * * * in * * * its sole discretion deems advisable, including officers or employees of * * * the supervising agency, as new directors to serve in the places of those removed * * * Directors so appointed shall serve only for a period coexistent with the duration of such violation or until the * * * supervising agency * * * is assured in a manner satisfactory to * * * it against violations of a similar nature” (emphasis supplied). It would distort the manifest intent of these provisions could a company reverse such a removal of its directors by the mere act of holding a stockholders’ meeting and re-electing those who were removed. The public purpose to be served by HDA supervision may not so easily be aborted. Clearly, reinstatement must be based upon findings of the HDA that the violation leading to the original substitution of directors has been obviated, and that similar violations will not take place if the status quo ante is restored.
If plaintiff was dissatisfied with the original removal of its nominees its proper remedy, never invoked and now time-barred, was to bring an article 78 proceeding challenging the agency’s determination (Goldstein v Urstadt, 74 Misc 2d 540). If it is plaintiff’s contention that there now exists no violation or potentiality for violation, application for a return of the nominees to the board should have been made to the HDA, not this court through the contrivance of an unenforceable "election”. By this proceeding, to which the HDA is not a party, plaintiff would collaterally attack the administrator’s decision. This is inconsistent with the policy of requiring exhaustion of administrative remedies before resort to judicial review (Sardino v Finch, 35 AD2d 686).
Additionally, it is noted that in consideration for the city’s agreement to increase the mortgage to finance the construction, plaintiffs nominees agreed to vote their shares for three directors designated by the HDA — a measure obviously sought *966 by the agency as a means of affording closer supervision of the development, following on the heels of the sharp rise in the final cost of the project incurred during the sponsor’s tenure. Moreover, plaintiff concedes that it has no interest in being restored to management other than being reimbursed for the very amounts which are presently in suit. No useful reason is seen for returning its nominees to the board at this stage of the action to serve this self-serving purpose. Finally, plaintiff has not sustained its position that it will suffer irreparable damage by virtue of HDA’s continued management of Cadman Towers.
The motion for a preliminary injunction is denied. Further, absent the HDA findings referred to above, the cross motion of defendant Cadman Towers, Inc., to dismiss the cause of action for a permanent injunction is granted.
The causes of action brought against the seven individual defendants as directors of Cadman Towers, Inc., may be readily disposed of. Three of the seven are HDA employees appointed to the board as replacements for the removed directors; another is an HDA employee appointed under the housing company’s certificate of incorporation to represent the interests of the tenants; the remaining three are private citizens, serving without compensation, designated by HDA pursuant to an agreement with plaintiff executed at or about the time the mortgage loan was increased. Subdivision 6 of section 32 of the Private Housing Finance Law, cited earlier, explicitly provides that in the absence of fraud or bad faith, directors appointed by the supervising agency "shall not be personally liable for debts, obligations, or liabilities of the corporation.”
Plaintiff complains generally that the defendants’ management of the co-operative has resulted in carrying charges for apartments at artificially low levels, subsidizing the tenant stockholders at the expense of creditors such as the plaintiff. In the first place, the amounts plaintiff seeks in this action are not payable from current rental income, but are earmarked to be paid from mortgage proceeds and capital contributions of subscribers. In any event, the HDA is legally empowered to approve rentals to be charged tenants in Mitchell-Lama projects (Private Housing Finance Law, § 31, subd 1). By plaintiffs own exhibit, the HDA has recently given notice to tenants of proposed increases in carrying charges — increases which, according to reports in the public press, will raise monthly *967 rentals to a point approaching that encountered in luxury housing, far above the "middle-class welfare” levels asserted by the plaintiff (see A Mid-Income Rent Crunch, New York Post, Oct. 3, 1975, p 2).
Absent an evidentiary showing of fraud or bad faith, no cause of action is perceived against the individual defendants, who replaced plaintiffs nominees under conditions less than favorable, and who continue to manage the company under the supervision of the HDA. The cross motion of the individual defendants to dismiss both causes of action against them for failure to state a cause of action is accordingly granted.
Plaintiffs first and second causes of action against Cadman Towers, Inc., respectively, relate to land allowance costs incident to the transfer of title to the co-operative, and development fees in connection with construction of the project. After the corporate defendant moved to dismiss these claims as premature, plaintiff moved for partial summary judgment for those amounts which Cadman Towers has refused to pay despite alleged approval (after audit) by the HDA. Plaintiffs application will be considered despite lack of service of a formal answer, as an application under CPLR 3211 (subd [c]) inasmuch as the defendant, in the voluminous affidavits, exhibits and memoranda submitted on the various motions before the court, has been afforded a full opportunity to demonstrate the existence of bona fide issues of law and fact bearing on the merits (Kronish, Lieb, Shainswit, Weiner & Hellman v John J. Reynolds, Inc., 33 AD2d 366; cf. Milk v Gottschalk, 29 AD2d 698).
Preliminarily, the court frowns upon plaintiffs inclusion in its moving papers of a memorandum prepared by defendant’s counsel during the course of settlement negotiations between the parties. The contents of the memorandum indicate that it was to be utilized strictly as a basis for settlement, and this is confirmed by the affidavit of its author. Therefore, the document, and references thereto in plaintiffs papers, is improper and will be disregarded (White v Old Dominion S. S. Co., 102 NY 660; Richardson on Evidence [10th ed], § 225).
The reimbursable land allowance costs plaintiff seeks consist of the actual costs attributable to plaintiffs acquisition and carrying of the land, including costs for demolition, improvements, relocation expenses, etc. The information bulletin covering the project stated that the HDA had audited the cost to the co-operative for acquisition of land from the *968 sponsor at $2,550,220; "said land cost and all other allowable costs, fees and expenses advanced by the Sponsor have likewise been or will be audited by the HDA before payment thereof by the Housing Company out of mortgage financing and equity funds.” This amount was approved for payment by resolution of the Cadman Towers, Inc., original board, and plaintiff concededly received same upon transfer of title to the co-operative, though the deed only recites a nominal consideration. Thereafter, the housing company (still under the control of plaintiff’s nominees) made the earlier-described request for an increase in the mortgage loan, based upon a recomputation of construction, land allowance, and other costs. The HDA, by letter to the Board of Estimate, approved and recommended the application, and annexed a schedule entitled "Estimated Development Costs and Capital Requirements,” which included the sum of $2,825,000 for "cost of land acquisition,” an increase of approximately $275,000 over the original audit. The housing company’s board subsequently authorized the increased mortgage, resolving that the additional land allowance fees be made part of a revolving fund to accomplish refunds to canceling subscribers. These facts compel the conclusion that the $2,825,000 figure included in the land allowance embodied in the mortgage proceeds authorized by the Board of Estimate, audited and approved by the HDA, and ratified by the defendant’s board, was the renegotiated resale price agreed to among all parties concerned.
Cadman Towers, Inc., contends that the action is premature on the theory that since Federal funds have been used in the project, in the form of grants under title I of the Federal Housing Act of 1949, concurrence by the Federal Department of Housing and Urban Development (HUD) to the adjusted land allowance costs is required before the HDA can authorize payment. While the defendant has referred the court to general provisions of the Federal Housing Act of 1949, as amended (US Code, tit 42, §§ 1441-1469), which sets forth HUD’s right to regulate local planning agencies (such as the HDA) in the administration of urban renewal programs, nothing expressed therein is seen as a defense to plaintiff’s cause of action against the co-operative.
Whatever the relationship between HUD and HDA, and whatever the factors which independently determine HDA’s eligibility to receive Federal subsidies for the project, it is evident that the guidelines governing the rights of the parties *969 to this action inter se (as expressed in the original 1963 agreement conveying title to the sponsor from the city [§ 605], the statute [Private Housing Finance Law, §23, subd 3], defendant’s certificate of incorporation and corporate resolutions, the information bulletin, and the construction contract) are those established and maintained by the HDA as the supervising agency. Hence, plaintiff is entitled to its land allowance costs previously audited and approved by the agency, without further "concurrence” by HUD, payable out of the increased mortgage proceeds and capital contributions. (Parenthetically, it is noted that no reason has been offered as to why Federal approval has not been secured, now almost four years since HDA’s acceptance.)
Partial summary judgment is therefore granted on the first cause of action in the amount of $187,562.94.
With respect to plaintiff’s cause of action for its development fee — covering expenditures by the sponsor for formation of the housing company, preparation of specifications for construction, sale of apartments, etc. — the information bulletin provided that "as consideration for the services rendered and to be rendered, the Developer-Sponsor shall receive a development fee approved by the HDA in the sum of $307,-700.” This amount was reaffirmed in the schedule accompanying the application for the increased mortgage loan approved by the Board of Estimate, and in the amended construction contract negotiated by the co-operative’s board. The sponsor has already received payment in the sum of $151,496.94, but defendant contends that plaintiff is not entitled to the balance because of its failure to perform, that is, it failed to produce a fully rented project. As a result of the publication of the misleading bulletin, and the subsequent demands for rescission by many subscribers, plaintiff’s nominees on the co-operative’s board were replaced by HDA directors (who assumed plaintiff’s responsibility for completion of the project), and many earlier sales were rescinded by the purchasers. Indeed, it appears that nearly half of the units stood vacant when the project was ready for occupancy, causing significant loss of income to the company. The sponsor’s contention that HDA approved the original construction contract, the information bulletin, and sale of apartments thereunder, thus estopping defendant from now raising objections to performance, is rejected. The fact that the HDA was less than vigilant in *970 discharging its supervisory function did not absolve the sponsor from its primary obligation to deliver a viable project.
The court finds that there are triable issues as to whether the sponsor earned the balance of its fee. Therefore, the motion for partial summary judgment on this cause of action is denied.
All claims not specifically disposed of above are severed. Defendant Cadman Towers, Inc., is directed to serve its answer within 20 days after service of a copy of the order to be entered hereon with notice of entry thereof.