George E. CLUTE, et al.

v.

The DAVENPORT COMPANY, et al.

Civ. No. H–83–817.

United States District Court, D. Connecticut.

June 7, 1984.

William J. Kupinse, Jr., Goldstein & Peck, Bridgeport, Conn., Mark A. Harmon, Gerald L. Sobol, Bondy & Schloss, New York City, for plaintiffs.

Michael C. Daly, William J. Tracy, Jr., Furey, Donovan & Heiman, Bristol, Conn., Joseph F. Skelley, Jr., Carl F. Yeich, Skelley, Clifford, Vinkels, Williams & Rottner, Hartford, Conn., Joel M. Grafstein, Lublin, Lublin, Wolfe, Kantor & Silver, East Hartford, Conn., Charles Gersten, Eliot Gersten, Hartford, Conn., Howard Wood, III, Glastonbury, Conn., Michael E. Grossman, Gersten & Gersten, Hartford, Conn., Frederick Krug, Waterbury, Conn., Warren B. Silberkleit, White Plains, N.Y., Louis B. Blumenfeld, Cooney, Scully & Dowling, Hartford, Conn., for defendants.

Nathan Weissberg, pro se.

## RULING ON MOTIONS TO DISMISS

BLUMENFELD, Senior District Judge.

### I. *Facts*

This action arises out of the formation of a series of limited partnerships formed to invest in Florida real estate, condominiums and foreign film rights. A major inducement for investing in this exotic group of properties was the beneficial tax treatment that could be expected by a limited partner. Plaintiffs, investors in the partnerships, claim that defendants engaged in a plan and scheme to defraud which violated federal and state securities laws, RICO, and breached duties owed to the plaintiffs. The alleged fraud occurred in two stages. First, plaintiffs claim fraud in the sale and promotion of group partnerships; second they claim fraud in the operation of the partnerships.

### A. *Sale of the Partnership Interests*

Defendant Davenport Company ("Davenport"), a Connecticut corporation, is the sole general partner in numerous limited partnerships. In 1979, Davenport formed a series of limited partnerships including those at issue in this case: Group 17, 18 and 22 Associates (the group partnerships). The sale of partnership interests to individual investors was undertaken by employees of P & I Equities, Inc. ("P & I") including defendants Weissberg, Adorno, Poirot, Powell, Raucci, and Kennedy. These salesmen acted at the direction of defendant Robert W. Johnson, a major shareholder and vice president of Davenport, vice president of P & I, and manager of P & I's

Glastonbury office. As part of its business, P & I sells annuities to school teachers. It obtained the names of many of the plaintiffs from its records of school teachers who had previously purchased annuities.

Davenport prepared a separate prospectus for each group partnership. Each prospectus was virtually identical to the rest. Most plaintiffs did not see the prospectus until they executed documents in connection with their purchase of securities; three plaintiffs were not shown a copy until after the purchase, and one never received a prospectus.

Many of the plaintiffs were shown a copy of An Assumption and Examples Memorandum ("Memorandum") despite the fact that said document clearly stated on its face that it was not to be shown to anyone but attorneys, accountants and investment advisors. The Memorandum stated that the securities represented sound investment strategy since, in addition to immediate tax benefits, income derived from the partnership would be deferred until later years.

It is alleged that the Memorandum also contained, or plaintiffs were shown, certain misleading figures and tables. For example, the discussion of investors' liability on certain recourse promissory notes was so phrased as to convince investors that they would not actually be liable on such notes. In addition, certain tables indicating potential profits and tax savings to investors showed the value of the securities to limited partners in a 30% tax bracket, despite the fact that all potential investors were required to have a portion of their income in a 50% tax bracket.

All plaintiffs were induced to execute a Note Assumption Agreement in connection with their purchase of the securities, according to which they became personally liable for a portion of certain recourse promissory notes (the "notes") executed by each of the group partnerships and payable to defendants Huntington Promotions, Inc. ("HPI"), Merit Management Corporation ("Merit"), and Chase, Morgan & Worth, Inc. ("Chase"). All three of these entities were under the control of James Johnson. Most of the plaintiffs were orally assured by their offeree representatives or other defendants that the Note Assumption Agreement was a formality for tax purposes and that they would never be liable therefor.

Each subscriber was required to execute subscription agreements acknowledging that he had a net worth of a given amount and that at least some portion of his annual gross income was subject to a federal income tax at a rate of 50% or higher. Despite such acknowledgements, many plaintiffs did not meet the above-mentioned financial requirements. Davenport required Group 17 investors to complete and submit an offeree questionnaire prior to Davenport's acceptance of their respective investments. Some plaintiffs who did not meet the financial requirements failed to execute the offeree questionnaire, while others supplied information which showed that they did not meet the said financial requirements. The sale of the securities was conducted, at least in part, in interstate commerce in that some individual defendants mailed documents to plaintiffs requesting the plaintiffs' signatures in order to complete the transaction.

## B. The Operation of the Group Partnerships

It was intended by Davenport that the group partnerships, among others, would purchase (i) certain undeveloped land in Florida and (ii) the United States and Canadian television rights to foreign language motion pictures (the "films"). Davenport represented to prospective purchasers of the securities that, because it was inexperienced in exploiting undeveloped land and television rights, the undeveloped land would be sold to experienced developers for construction of condominiums. Davenport also represented that third parties would be hired to dub the films into English and lease them to various television stations, in exchange for advertising time to be used in connection with the sale of the condominiums.

In 1979, Davenport purchased, either through or with the assistance of HPI, an option to buy a 60-acre tract of land in the State of Florida (the "land") and arranged to purchase the films directly from HPI. Davenport structured the purchase of the land as independently exercisable options to purchase separate parcels thereof and structured the purchase of the films in separate and distinct groups. It was understood by the parties to that transaction that Davenport would employ Merit and Chase to operate the properties. It was further understood by the parties to that transaction that Merit would delegate much of its authority to defendant Management Consultants, Inc. ("Consultants"), a corporation under the control of Howard Levy, president of Davenport, and his wife, Eileen Levy.

Davenport represented that Group 17 and Group 18 would each purchase 20 acres of the land and three of the films. Group 22 would purchase ten acres and one film. Interests in each partnership were divided into 32 units, at a cost of $30,000 per unit. Each limited partner would also be liable to pay his or her pro rata share of the notes, all of which are to become due ten years after the date of closing, together with interest at 9½% per annum. For Groups 17 and 18 these included a note in the sum of $1,005,000 payable to HPI, issued in connection with the purchase of the films, and notes in the sum of $709,000, payable to Merit, and in the sum of $1,140,000 payable to Chase as prepayment for services to be rendered by them. The notes executed on behalf of Group 22 were identical in purpose and were equal in dollar amount to one-half of those executed on behalf of Groups 17 and 18. Plaintiffs claim that the price paid for the films was grossly in excess of the fair and reasonable value thereof.

In addition to the notes, each of Group 17 and Group 18 paid $195,000 to HPI, $31,000 to Merit and $30,000 to Chase. Further, each of Groups 17 and 18 paid selling and brokerage commissions and finders fees in the amount of $192,000. Group 22 made identical payments except that the amount thereof was one-half the amount so paid by each of Groups 17 and 18.

Plaintiffs allege that although the land and the films were the subject of one single transaction, the properties were divided among the group partnerships and other Davenport partnerships in order to make it appear that the sale of the securities was a small private offering which would be exempt from federal and state registration and informational requirements.

The prospectus and the Memorandum state that each of the group partnerships would retain Internecine Productions, Inc., an alleged expert in the field, to sell the films; this company, however, was never retained for any purpose. Instead, Davenport retained defendants Merit and Chase, allegedly to manage the business of the group partnerships. Davenport did not disclose that Merit and Chase were operated and controlled by James Johnson, the same person who was originally involved in the transfer of the properties to the group partnerships. In addition, Davenport, Howard Levy, Robert Johnson and James Johnson failed to disclose that each of the group partnerships, among other Davenport partnerships, had agreed to pay Merit and Chase a separate fee for performing what were virtually identical services. They also failed to disclose that Davenport would receive $40,000 from Groups 17 and 18 and $20,000 from Group 22 as "compensation" for what were identical organizational services.

On December 8, 1980, Merit delegated all of its responsibilities and authority for managing each of the group partnerships, except the promotion of the films, to Consultants. As consideration for assuming these responsibilities, Consultants was to receive 30% of the fees to be paid to Merit by the group partnerships. Defendant Green and Kleinman, P.C. ("G & K") drafted at least the Sales and Consulting Agreement executed by Group 17 and Chase, the Management Agreement executed by Group 17 and Merit, and the Delegation

Agreement executed by Merit and Consultants.

Despite a statement in the prospectus that the land would be sold to a developer (since Davenport did not possess the expertise necessary for the intended development), the land was sold to at least two other Davenport partnerships in exchange for (i) a percentage of the net profits returned from the development of condominiums and (ii) nonrecourse promissory notes. Defendants Davenport, Robert Johnson and Howard Levy have made false statements as to the development of the land and the marketing of the films. In 1980 and 1981 these defendants paid to each plaintiff certain sums of money which, though claimed to be proceeds from their investments, were in fact obtained by the defendants from investors in other Davenport partnerships.

No effort has yet been made to sell the films, nor have any of them been dubbed into English in preparation for such sales. By reason thereof, and of Merit's said delegation to Consultants, neither Merit nor Chase has performed any of the functions for which they were retained, although they received substantial cash payments in advance. Further, the notes issued to Chase and Merit made no reference to the performance by them of their obligations as a condition of payment.

### C. *IRS Determination and Suit by Merit*

Beginning in June 1983, the Internal Revenue Service ("IRS") notified many of the plaintiffs that the tax deductions each of them had claimed by virtue of their ownership of the securities would not be allowed because *inter alia,* the group partnerships were not functioning as business entities as Davenport and others represented they would. Once certain limited partners became aware of the IRS notification, they made a request upon Davenport to examine the books and records of the corporation. These requests were denied.

In June 1983, Merit commenced a suit in Florida State Court against Group 17, Davenport and "John Doe, a limited partner in Group 17 Associates," (the "Florida suit"), alleging that it had not been paid under its management contract and that the individual limited partners of Group 17 were required to pay their pro rata share of the note issued as prepayment for services to be rendered. Defendant Starling, the attorney representing Merit in the action, is the same person who drafted or took part in the drafting of the prospectus for the group partnerships.

Defendant Howard Levy, or a company or entity under his control, has since purchased 100% of the shares of HPI. Additionally, James Johnson has informed certain limited partners that all of the notes are presently in the possession of Howard Levy.

Motions to dismiss have been filed by defendant Green & Kleinman, Robert Johnson, Davenport, Howard and Eileen Levy, Huntington Promotions, Management Consultants, John Starling, Anthony Raucci, James Kennedy, Nathan Weissberg, and P & I Equities. These motions are overlapping and jumbled. In an effort to shape an orderly case out of the presently confused situation, the motions will be considered by issue rather than by party.

### II. *Failure to Plead Fraud with Particularity*

■ At numerous points in their briefs, defendants have argued that plaintiffs failed to comply with Fed.R.Civ.P. 9(b) which requires that the circumstances constituting fraud be pleaded with particularity. As evidenced by the facts set out *supra,* the alleged scheme perpetrated by the defendants was a complex one; nevertheless, the plaintiffs have offered a full and clear description of this scheme in the complaint. Except as explained on page 1570 *infra,* plaintiffs' averments are sufficient to place the defendants on notice of the acts alleged to constitute fraud and sufficient to allow the defendants to form a meaningful response. In particular, it might be noted that the allegations as to Green & Kleinman clearly satisfy these

requirements.[1] The acts of Green & Kleinman are set forth with particularity along with allegations that they acted knowingly in its participation and furtherance of this scheme. Amended Complaint, filed Dec. 12, 1983, ¶¶ 53, 80, 82.

### III. *Failure to Allege Scienter*

■ Defendants have argued that plaintiffs' allegations that defendants "knew or should have known" of certain matters is no more than an allegation of common law negligence; as such, it is argued, no federal securities claim is stated. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (section 10(b) requires allegations of scienter; liability may not be premised on mere negligence). Because they contain the allegation that defendants knew of the scheme, such "knew or should have known" allegations have been held to state a federal securities claim. *IIT v. Cornfeld*, 619 F.2d 909, 924 (2d Cir.1980).

### IV. *Failure to Allege Manner of Assistance*

■ Defendant G & K argues that the complaint is defective in that plaintiffs have not alleged the manner in which G & K's drafting of the documents substantially assisted the alleged primary violation of the securities laws. Motion to Dismiss or/in the Alternative Motion for More Definite Statement, filed by G & K Mar. 19, 1984. This argument ignores the clear language of paragraph 53 of the complaint: G & K "either knew or should have known that [the agreement drafted by them] effected a collusive arrangement between the above-named defendants, by which the management of the properties remained in the hands of defendants Howard Levy and Robert Johnson despite their admissions that they were unfit for such services."

### V. *RICO*

Plaintiffs' thirteenth cause of action alleges violations of 18 U.S.C. § 1964(c) (RICO).

### A. *Receipt of Income from Racketeering*

Defendants contend that the complaint fails to state a claim because paragraph 140 fails to allege that defendants received any income from any acts of securities fraud and fails to allege that defendants invested any money in the establishment or operation of any enterprise. This argument appears to suggest that plaintiffs have failed to state a claim pursuant to section 1962(a); however, it ignores section 1962(c) which does not require allegation of receipt and investment of funds:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As discussed more fully *infra*, plaintiffs' allegations meet this requirement.

### B. *Pleading of Two Acts of Racketeering Activity*

■ In order to state a claim under RICO, plaintiff must meet two pleading requirements: (1) that of pleading racketeering activity, and (2) that of pleading racketeering injury. The first of these requirements was recently discussed in *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17–18 & n. 13 (2d Cir.1983).

> Plaintiff sought to satisfy both the "pattern" and "racketeering" elements of RICO by alleging that "[d]efendants' actions as set forth herein in this Complaint constitute at least two acts of fraud in connection with the purchase and sale of securities and as such represent a pattern of racketeering activity within the meaning of RICO." Thus, the complaint clearly relies on [defendants'] allegedly "fraudulent" securities transactions ... as the predicate acts of "racket-

**1.** The motion filed by Green & Kleinman has been adopted by several other defendants.

eering" that form the "pattern" underpinning plaintiff's RICO claim. Such allegations of fraud would ordinarily satisfy RICO's "racketeering activity" pleading prerequisite.

*Id.* at 17–18 (citations omitted). Thus, a plaintiff may satisfy the requirement of pleading racketeering activity merely by alleging two acts of "garden variety securities fraud." *Id.* at 18 n. 13. Defendant G & K argues, however, that plaintiffs have failed to identify the requisite two predicate offenses.

■ Plaintiffs respond that paragraph 53 of the general allegations of the amended complaint contains averments of the two predicate offenses. The first of these is clearly alleged: that while acting as attorneys for Group 17 G & K drafted a set of documents pursuant to the scheme to defraud. Plaintiffs claim that G & K may also have drafted the same sets of documents for Groups 18 and 22, as well as other documents which aided in the fraud. Plaintiffs argue that paragraph 53 implicitly alleges the existence of other such documents in its averment: "Defendant Green and Kleinman, P.C. drafted *at least* the Sales and Consulting Agreement executed by Group 17 and Chase ...." (Emphasis added.)

Such an allegation is not sufficiently specific with regard to the second act of racketeering activity to place defendants on notice as to the acts complained of. In their motion, plaintiffs claim to have become aware of new information regarding G & K's involvement in the scheme. Such allegations must be made in the form of a pleading. Plaintiffs have 30 days in which to allege with specificity G & K's additional conduct constituting a second predicate offense under RICO.

### C. *Racketeering Enterprise Injury*

Defendants argue that plaintiffs have failed to meet 18 U.S.C. § 1964's requirement of alleging an injury resulting "by reason of" a violation of section 1962. Defendants argue that, in addition to alleging that the defendant engaged in the prescribed RICO activity, a plaintiff must also allege "that the injuries he sustained were caused by the distinctive RICO violation, and not simply by the commission of the predicate offenses." *Guerrero v. Katzen,* 571 F.Supp. 714, 718 (D.D.C.1983).

Plaintiffs respond that federal courts are split over whether a distinct racketeering enterprise injury must be alleged in a civil RICO suit, that the Second Circuit has specifically declined to address this question, *Moss v. Morgan Stanley, Inc.,* 719 F.2d at 20 n. 16, and that this court should not establish such a requirement.

Section 1964(c) provides for civil remedies to "[a]ny person injured in his business or property by reason of a violation of Section 1962." In interpreting section 1962, the Second Circuit has explained that a plaintiff may state a claim for violation of that section by alleging that a defendant engaged in a pattern of racketeering activity. *Moss v. Morgan Stanley, Inc.,* 719 F.2d at 17. A pattern of racketeering activity is in turn defined in section 1961(5) as at least two acts of "racketeering activity" occurring within ten years of each other. Lastly, "racketeering activity" is the commission of any act listed in section 1961(1) including "any offense involving ... fraud in the sale of securities ...." § 1961(1)(D).

A literal interpretation of the statute might lead one to the conclusion that a defendant is civilly liable under RICO merely upon the showing that he has committed any two of the predicate offenses. Such a reading, I believe, would be in error because it fails to recognize that Congress meant to limit redress to injuries caused by racketeering. As Judge Learned Hand wrote 40 years ago:

There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how

they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final.

*Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (concurring opinion), *aff'd sub nom., Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). Further, as Judge Friendly explained:

> Congress is free, within constitutional limitations, to legislate eccentrically if it should wish, but courts should not lightly assume that it has done so. When the "plain meaning" of statutory language "has led to absurd or futile results", the Supreme Court "has looked beyond the words to the purpose of the act"; "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole'" the Court "has followed that purpose rather than the literal words." *United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). "Anything that is written may present a problem of meaning, and that is the essence of the business of judges in construing legislation", Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 528 (1947).

*J.C. Penney Co. v. Commissioner of Internal Revenue,* 312 F.2d 65, 68 (2d Cir.1962).

These principles were reaffirmed by the Second Circuit in *Marriott In-Flite Services v. Local 504, Transport Workers of America,* 557 F.2d 295, 298–99 (2d Cir. 1977):

> There is no longer a "plain meaning rule" requiring a court to reach results completely at variance with the intent of the statute. As Mr. Justice Holmes stated in a celebrated passage:
>
> > It is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.
>
> *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928).

Further, as Judge Meskill wrote, the Second Circuit has "reject[ed] the idea that anything has 'plain meaning' divorced from its context." *Marriott In-Flite Services v. Local 504,* 557 F.2d 295 at 298 n. 6. Thus, I reject the argument that an adherence to a literal interpretation of RICO is compelled. Instead, I turn to Congressional intent as expressed in the legislative history and in the terms employed in the statute.

In interpreting the "by reason of" requirement of section 1964(c), proponents of both sides of the issue have turned to an analysis of the legislative history. In favor of the view that a separate and distinct racketeering injury is required, Judge Sweet explained in *Hudson v. LaRouche,* 579 F.Supp. 623, 630 (S.D.N.Y.1983):

> The fact that efforts to limit substantively the applicability of RICO's considerable equitable civil remedies have met with disfavor in a majority of the circuits should not obscure the remaining necessity for this court to construe the legislative intent behind the restrictive words "by reason of" in the 1964(c) private treble damage provision. *Harper v. New Japan Securities Intern., Inc.,* 545 F.Supp. 1002, 1006 (C.D.Cal.1982). As the California district court in *Harper* noted:
>
> > ... [T]he requirement that the injury to be redressed occur "by reason of" a violation of § 1962 is the most meaningful limitation which can be imposed on § 1964(c). Only if this causal connection exists will the policies and purposes of RICO be served by permitting a private right of action. This construction while avoiding the imposition of the antitrust requirement of "competitive injury," recognizes the similarities between the RICO treble damages provision and § 4 of the Clayton Act. In light of Congress' failure to provide

any direction in determining the rules of standing appropriate to the RICO treble damage provision, the antitrust analogy is the construction of the statute which is most likely to reflect Congress' understanding of the words "by reason of."

*Harper, supra,* 545 F.Supp. at 1008.

Similarly, in *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206, 208 (E.D.Mich. 1981), the Michigan district court did not require a "competitive injury" as the term is understood in the antitrust context but held that to have standing to bring a RICO treble damage action, a plaintiff must allege that he has suffered a "racketeering enterprise injury," or in other words, the kind of injury that RICO was intended to prevent.

Further support is provided by Judge Pollack who noted in *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1361 (S.D.N.Y. 1983):

there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties. For example, it was clearly established at the time that RICO was enacted that there was no private right of action for violations of the mail fraud statute. It is implausible that Congress could have meant to alter this accepted rule to the extent of creating a right of action for treble damages without a single mention of such a revolutionary consequence anywhere in the legislative history.

Many other courts have held to a similar view. *Freschi v. Grand Coal Venture,* 583 F.Supp. 780 (S.D.N.Y.1984); *Furman v. Cirrito,* 578 F.Supp. 1535, 1539–40 (S.D.N.Y.1984); *Richardson v. Shearson/American Express Co., Inc.,* 573 F.Supp. 133, 136 (S.D.N.Y.1983); *Waste Recovery Corp. v. Mahler,* 566 F.Supp. 1466 (S.D.N.Y.1983); *Bankers Trust v. Feldesman,* 566 F.Supp. 1235 (S.D.N.Y.1983); *Landmark Savings & Loan v. Loeb*

*Rhoades, Hornblower & Co.,* 527 F.Supp. 206, 208 (E.D.Mich.1981).

In espousing the opposite view, Judge Duffy explained:

Although I am sympathetic to the argument that Congress may not have envisioned that plaintiffs would use RICO to circumvent the damage provisions of the securities laws, I do not believe that the "racketeering" and "competitive injury" requirements are consistent with the legislative history. Congress did not intend to limit RICO "by anti-trust concepts like 'competitive,' 'commercial,' or 'direct or indirect' injury." Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 280 (1982); *see also Hanna Mining Co. v. Norcen Energy Resources Ltd.,* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D.Ohio June 11, 1982). The legislative history shows that Congress rejected early efforts to draft RICO-like statutes within the antitrust context, apparently on the grounds that anti-trust concepts like "standing" and "proximate cause" would create "inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recover." *Report of Antitrust Section of the ABA,* reprinted in 115 *Cong.Rec.* 6994–95 (1969) ....

*Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231, 1240 (S.D.N.Y. 1983).

Many courts have agreed with this view. *See, e.g., Bennett v. Berg,* 685 F.2d 1053, 1059 (8th Cir.1982), *aff'd in relevant part en banc,* 710 F.2d 1361 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Schacht v. Brown,* 711 F.2d 1343, 1357 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y.1981); *Meineke Discount Muffler Shops, Inc. v. Noto,* 548 F.Supp. 352, 354 (E.D.N.Y.1982); *Kimmel v. Peterson,* 565 F.Supp. 476, 493 (E.D.Pa.1983).

The legislative history has thus been read to support both sides of this argument. This is in part attributable to the fact that the addition of a private right of action to the preliminary draft of the RICO statute did not generate discussion in either the House or the Senate. *See* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L. Rev. 1101, 1112 n. 62 (1982).

■ Congress' decision to use the word "racketeering" in the statute provides some illumination as to the requirement of alleging a racketeering enterprise injury. If Congress had meant to design a statute providing criminal and civil penalties for multiple violations of the laws, it could have done so by using terms such as "recidivist" or "repeat offender." Instead, Congress chose to use the word "racketeering." The word "racketeering" is *sui generis* and must be given some meaning. Whereas most racketeers are multiple offenders, the converse is not true;[2] thus, racketeering means something more than recidivist activity. Hence, when Congress sought to punish those who caused injury by reason of racketeering activity, it did not mean to impose penalties on all who inflicted injury through multiple or repeat violations of the laws, but only on those who caused injury by racketeering. To rule otherwise would make the word "racketeer" meaningless and lead to the assumption that after months of study Congress used the wrong word in both the title and text of the Racketeer Influenced and Corrupt Organizations Act. By its decision to use the word "racketeering," Congress meant to limit the application of the RICO statute. Thus I join those courts which have held that a distinct enterprise injury is required. An injury by reason of a pattern of racketeering must be more than merely two injuries from securities violations.

■ Having reached the decision that allegation of a separate racketeering injury is required, the more difficult question of defining what constitutes racketeering injury still remains. An enterprise with a ready supply of capital typically enjoys an advantage in its dealings with competitors, suppliers, purchasers and all others with which it comes in contact. When that capital is supplied through certain illegal means, those who are injured may call RICO into play. *See Moss v. Morgan Stanley, Inc.,* 553 F.Supp. at 1361 (noting that RICO is a weapon to be used against those "who have gained an unfair competitive or financial advantage through criminal means associated with racketeering"). Further support for this view is provided by the definition of racketeering enterprise injury employed by the court in *Landmark Savings & Loan v. Leob Rhoades, Hornblower & Co.,* 527 F.Supp. at 209:

> A "racketeering enterprise injury" might occur, for example, if a civil RICO defendant's ability to harm the plaintiff is enhanced by the infusion of money from a pattern of racketeering activity into the enterprise.

*Id.* at 209.

■ Plaintiffs have satisfied the requirement of alleging a racketeering enterprise injury. Plaintiffs allege that defendants initially committed securities violations in the sale of the partnership interests and dissemination of misleading information regarding the note assumption agreements. Defendants' ability to harm the plaintiffs was enhanced by the funds generated from these violations. The funds were used by the group partnerships to purchase land and foreign films from defendants in such a way as to benefit defendants at plaintiffs' expense. The price the group partnerships paid to HPI for the films was grossly in excess of their reasonable value. Further, with the funds raised through the initial securities violations, the group partner-

---

**2.** *See* Note, *RICO and Securities Fraud: A Workable Limitation,* 8 Colum L.Rev. 1513, 1524 (1983):

At the time of RICO's passage, Congress recognized that organized crime violates some of the securities laws. But this fact does not justify the conclusion that Congress wanted *all* securities violations to be predicate offenses under RICO.

ships entered into management agreements with Chase and Merit resulting in further defrauding of plaintiffs. Additionally, defendants have used the funds from the fraudulent sales to one group partnership to aid in their scheme to defraud other group partnerships. In 1980 and 1981 defendants Davenport, Johnson and Levy allegedly paid sums of money to each plaintiff which, though claimed to be proceeds from group partnerships' investments, were in fact obtained from investors in other Davenport partnerships. Further, the existence of several partnerships enabled defendants to render a separate charge to each partnership for the identical services. Defendants' motions to dismiss plaintiffs' RICO claims are thus denied.

## VI. Private Right of Action Under State Securities Laws

### A. Connecticut Securities Law Claims

■ Plaintiffs' eighth cause of action is based upon Connecticut General Statutes § 36–472. That section provides:

No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Defendants contend that section 36–472 does not provide plaintiffs with a private cause of action. Defendants argue that by virtue of section 36–496, enforcement of section 36–472 is the responsibility of the banking commissioner. Although section 36–496 does not explicitly so provide, section 36–497(a) does allow for the imposition of fines for violations of section 36–472. The appropriate section for bringing a private action, according to defendants, is section 36–498(a), which provides in part:

Any person who: (1) Offers or sells a security in violation of subsection (a) of section 36–474, 36–485 or subsection (b) of section 36–493 or of any regulation or order under section 36–491 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under subsection (d) of section 36–487 or subsection (g) or (h) of section 36–488; or (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security ....

Plaintiffs point out that section 36–472 tracks almost word-for-word the language of Rule 10b–5 (C.F.R. § 240.10b–5). Because Rule 10b–5 creates a private right of action under the federal securities laws, *see* *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), plaintiffs contend that its state law analogue should similarly create a private right of action.

No court has ruled on the question of whether a private cause of action exists under section 36–472.[3] I need not reach

---

**3.** Plaintiffs are correct in their assertion that Rule 10b–5 is relevant in interpreting this statute. In discussing section 36–338, the predecessor of section 36–472, the Connecticut Supreme Court recently explained:

Section 36–338 prohibits certain activities in connection with the sale or purchase of any security. Because this statute is modeled af-

ter § 10(b) of the Securities Act of 1934 and § 17(a) of the Securities Act of 1933, we may look to decisions under the federal law for guidance

*Merrill Lynch, Pierce, Fenner & Smith v. Cole*, 457 A.2d 656, 664, 189 Conn. 518 (1983). The inquiry, however, should not be limited to analogous federal statutes. The Connecticut

that question, however, as plaintiffs have clearly pled facts sufficient to state a claim under section 36–498. As the Ninth Circuit ruled in *Sessions v. Chrysler Corp.*, 517 F.2d 759, 760–61 (9th Cir.1975), "The fact that appellant mislabeled his cause of action against the individual defendants is irrelevant, so long as he was entitled to relief against them under any theory." *See also* 2A *Moore's Federal Practice* ¶ 8.14 at 8–133–34 (A party is not "required to pick and stick to one theory of law ... only to find when he gets to trial that he has chosen the wrong one." (quoting Judge Charles E. Clark, Proceedings of Cleveland Institute on Federal Rules (1938) 234)). It is particularly inappropriate to dismiss a claim for pleading the wrong theory. Plaintiffs' complaint is thus similar to that in *Stanley v. Harper Buffing Machine Company*, 28 F.R.D. 579 (D.Conn.1961) where this court ruled:

> This complaint still contains such a conglomeration of legal theories and conclusions of fact and of law as to now make it no less difficult to try to find some precise statement of the plaintiff's claim to grasp hold of than it was before. Nonetheless, the court is not permitted to impose a sanction as drastic as a judgment of dismissal ... but "must look beyond the mere mountain of words to the meaning sought to be conveyed."

*Id.* at 581 (quoting Chief Judge Clark's opinion in *Nagler v. Admiral Corporation*, 248 F.2d 319, 325 (2d Cir.1957).

The application of section 36–498 rather than section 36–472 deflates the defendants' argument that the latter statute provides no basis for the imposition of secondary liability. Section 36–498(b) specifically provides for the imposition of joint liability upon aiders and abettors.

**B.** *New York Securities Law Claim*

Plaintiffs' twelfth cause of action states: Pursuant to New York State General Business Law § 352–C, any person or corporation, including an officer and/or employee of said corporation, who engages in a scheme to defraud the purchaser of securities may not employ any fraud, deception or concealment or make any unreasonable promise or representation or any false statement or representation to induce or promote the sale of said securities.

Defendants concede that NYGBL § 352–c provides plaintiffs with a private cause of action. They argue, however, that the statute is not so broad as to encompass secondary liability. No court has yet ruled on whether section 352–c imposes secondary liability for aiding and abetting a securities fraud; however, given the intent and background of the statute as expressed by the New York legislature and courts, I conclude that New York courts would hold that such activity is prohibited by the statute. Section 352–c (formerly section 23A) was enacted as part of the Martin Act. The legislature directed that the provisions of this section "are to be liberally construed." (L.1955, ch. 553 § 4), *quoted in People v. Florentino*, 116 Misc.2d 692, 456 N.Y.S.2d 638, 641 n. 4 (N.Y.Crim.Ct.1982). In interpreting the Act, one New York court has pointed out

---

Securities Act is based upon the Uniform Securities Act. M. Sudarsky, *Securities Regulation*, 54 Conn.Bar J. 432, 433 (1980). Therefore some illumination as to the existence of a private right of action may be provided by the interpretation of analogous sections as adopted by other states. One specific factor which might influence this question is the interpretation of section 36–498(h) which provides:

> The rights and remedies provided by this chapter are in addition to any other rights or remedies that may exist at law or in equity.

Perhaps significantly, in adopting this section from section 410(h) of the Uniform Securities

Act, the Connecticut legislature excised the words, "but this act does not create any cause of action not specified in this section." *See Cahill v. Ernst & Ernst*, 625 F.2d 151, 154 (7th Cir. 1980) (interpreting Wisconsin analogue to section 410(h) and noting that the "draftsmen of the Uniform Securities Act had indicated that the excised phrase was intended to abrogate a private cause of action."); *Goodman v. Poland*, 395 F.Supp. 660, 680–81 (D.Md.1975) (interpreting Maryland analogue to section 36–472).

[t]he words "fraud" and "fraudulent practice" as used in the act are given a wide meaning to include all deceitful practices contrary to the plain rules of common honesty. Its purpose is to defeat any scheme whereby the public is exploited.

*People v. Cadplaz Sponsors, Inc.*, 69 Misc.2d 417, 330 N.Y.S.2d 430, 432 (Sup.Ct. 1972) (citations omitted). As further evidence of the broad construction to be applied to the statute, I note the memorandum written by then New York Attorney General Jacob Javits in support of Chapter 553 of the Laws of 1955 which added section 352–c:

These proposed amendments to the statute are not intended to narrow or to repeal the coverage of prior language but rather they are intended to expressly broaden those acts and practices coming within the condemnation of the statute.

New York State Legis.Ann., 1955, at 133, *quoted in People v. Barysh*, 95 Misc.2d 616, 408 N.Y.S.2d 190, 194 (Sup.Ct.1978). Also, as a New York court has explained:

This amendment was not enacted in a vacuum. The highest court of this state had already interpreted the existing civil provisions of the Martin Act to include "... all acts, although not originating in any actual evil design or contrivance to perpetrate [a] fraud or injury upon others ..." (*People v. Federated Radio Corporation*, [244 N.Y. 33, 38–39, 154 N.E. 655, 657 (N.Y.1926) ] ).

*People v. Barysh*, 408 N.Y.S.2d at 194. Lastly, it should be noted that the reach of the Martin Act is especially broad. All acts tending to deceive or mislead the public are prohibited; unlike the federal securities laws, the Martin Act does not require plaintiffs to prove scienter or intent to defraud. *People v. Cadplaz Sponsors, Inc.*, 330 N.Y.S.2d at 432.

## VII. *Statute of Limitations*

Defendant Robert Johnson is joined by several other defendants in arguing that certain of plaintiffs' claims are barred by the statute of limitations.

### A. *Counts 1 and 2*

■ Plaintiffs' first cause of action is based upon section 12(1) of the Securities Act (15 U.S.C. § 77*l* (1)). Their second cause of action is based upon section 12(2) (15 U.S.C. § 77*l* (2)). Section 13 of the Act (15 U.S.C. § 77m) requires that

No action shall be maintained to enforce any liability created under section 11 or section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(1), unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 11 or section 12(1) more than three years after the security was bona fide offered to the public, or under section 12(2) more than three years after the sale.

The actions complained of in the first two counts took place no later than January 1980. Plaintiffs filed their first complaint in October 1983—more than three years after the acts alleged. Defendants argue that these claims are barred by section 13.

Plaintiffs respond that the statute of limitations is subject to the doctrine of equitable tolling. As a general proposition, plaintiffs quote *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946):

[T]his Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and "remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party com-

mitting the fraud to conceal it from the knowledge of the other party." *Bailey v. Glover*, 21 Wall. 342, 348 [22 L.Ed. 636]; and see *Exploration Co. v. United States*, 247 U.S. 435 [38 S.Ct. 571, 62 L.Ed. 1200]; *Sherwood v. Sutton*, 5 Mason 143.

This equitable doctrine is read into every federal statute of limitation.

Plaintiffs also cite several cases in which section 13 was tolled because of the concealment of a cause of action from plaintiffs. *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir.1969); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 553 (S.D.N.Y. 1977); *Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319, 1322–23 (D.D.C.1977). In all of these cases, however, the alleged violation occurred within three years of the filing of the complaint. The statute was tolled only insofar as it allowed claims to be brought more than one year after the fraud. Only one case cited by plaintiffs directly supports their argument. *In re Home-Stake Production Company Securities Litigation*, 76 F.R.D. 337, 344–45 (N.D.Okla.1975). This is decidedly the minority view. All other courts which have considered the question have ruled that section 13 imposes an absolute time bar of three years. *See, e.g., Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir.1981), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3485, 73 L.Ed.2d 1367 (1982); *Turner v. First Wisconsin Mortgage Trust*, 454 F.Supp. 899 (E.D.Wisc.1978); *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283, 289–91 (W.D.N.Y.1977); *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394, 397 (M.D.La.1974).

I find the majority view persuasive. If the three-year limit could be tolled, section 13 "would create a limitation period for all suits of one year from the time discovery of the untrue statements or omissions should have been made, and the three-year provision would serve no purpose at all."

*Turner v. First Wisconsin Mortgage Trust*, 454 F.Supp. at 911. Plaintiffs' first and second claims are therefore dismissed.

### B. Counts 3, 4, 5 and 13

Count 3 is based on section 17 of the Securities Act (15 U.S.C. § 77q). Count 4 is based on section 15(c)(1) of the Exchange Act (15 U.S.C. § 78o (c)(1)). Count 5 is based on section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (C.F.R. § 240.10b–5). Count 13 is based on RICO (18 U.S.C. § 1964(c)). None of these statutes is subject to an express federal statute of limitations; both sides agree that the applicable statute of limitations is Conn. Gen.Stat. § 36–498(e). *See Dandorph v. Fahnstock & Co.*, 462 F.Supp. 961, 963 n. 4 (D.Conn.1979). That section provides, "No person may sue under this section more than two years after the contract of sale." Defendants contend that plaintiffs' claims are barred as they were not brought within two years of the contracts of sale of securities. Plaintiffs, however, argue that in determining when the limitations period begins, this court must look to federal law, rather than the Connecticut statute. "While federal law looks to state law for the relevant period of limitation when none has been provided in the federal statute, federal law controls on the question when that period begins to run." *IIT v. Cornfeld*, 619 F.2d 909, 929 (2d Cir.1980); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir.1979). The limitations period does not commence at the time of the sale of the securities; instead the "federal rule with respect to discovery of fraud is that 'the statute commences to run when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge.'" *ITT v. Cornfeld*, 619 F.2d at 929. *Robertson v. Seidman & Seidman*, 609 F.2d at 587. This principle of equitable tolling has been applied to the two-year limitation period found in the Connecticut state securities

laws. *Long v. Abbott Mortgage Corp.*, 459 F.Supp. 108, 113 (D.Conn.1978).

There is some split in authority as to the requirement for the invocation of the equitable tolling doctrine. The general rule was described as follows:

> The two elements of equitable tolling were first articulated in [*Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874)] where the Court held that "[1] when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud ... and [2] when the fraud has been concealed, or is of such character as to conceal itself, [then] the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing ...." 88 U.S. (21 Wall.) at 349–50. Both elements require consideration, first, whether the plaintiff was without fault for his ignorance, that is, was he "diligent," and second, whether or not there was "concealment."

*Long v. Abbott Mortgage Corp.*, 459 F.Supp. 108, 113 (D.Conn.1978).

The defendants point out that the plaintiffs have failed to allege due diligence. Such failure, defendants argue, warrants dismissal.

The view that equitable tolling requires both concealment and diligence is one that has been adopted by several courts: *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127–28 (6th Cir.1982); *State of Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687, 694–95 (10th Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1170 n. 27 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). Defendants' argument ignores the fact that the Second Circuit, as well as several other courts, has adopted the rule that where there is active concealment,[4] a plaintiff's due diligence is irrelevant. *Robertson v. Seidman & Seidman*, 609 F.2d at 593 (2d Cir.1979); *Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir.1975); *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975); *McConnell v. Frank Howard Allen & Co.*, 574 F.Supp. 781, 787–88 (N.D.Cal.1983).

In adopting the active/passive distinction, the Second Circuit stated:

> Under the federal equitable tolling doctrine, the active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct of the opposing party. *See Atlantic City Electric Co. v. General Electric Co.*, 312 F.2d 236, 239 (2 Cir.1962) (en banc), *cert. denied*, 373 U.S. 909 [83 S.Ct. 1298, 10 L.Ed.2d 411] (1963). As Judge Tone stated in his excellent opinion for the Seventh Circuit in *Sperry v. Barggren, supra*, 523 F.2d at 711 (citations omitted):
>
> > "One issue before the District Court was thus the presence or absence of concealment. Should active concealment be found, then the statute is tolled until actual discovery.... If no active concealment is present, then the issue becomes whether knowledge of the alleged fraud could reasonably have been acquired [at an earlier date] with the exercise of due care."
>
> ... Judge Tone's opinion is one of the leading ones dealing with the federal equitable tolling doctrine. We agree with Judge Tone's opinion.

4. Passive concealment occurs when the defendant commits fraud but then takes no further action to disguise the fraud from the plaintiff. In contrast, active concealment occurs when the defendant actually takes affirmative steps in addition to the original fraud to prevent plaintiff from discovering the scheme. Plaintiffs concede that when only passive concealment is alleged, the statute begins to run on the date of discovery or when in the exercise of due diligence the plaintiff should have discovered the fraud. For active concealment, however, plaintiff contends that the statute does not begin to run until the date of actual discovery.
*McConnell v. Frank Howard Allen & Co.*, 574 F.Supp. 781, 787–88 (N.D.Cal.1983).

*Robertson v. Seidman & Seidman,* 609 F.2d at 593.[5]

■ Plaintiffs' allegations of concealment are sufficient to toll the applicable statute of limitations. Plaintiffs have alleged not only an initial deception on the part of defendants, but also a cover-up designed to prevent discovery of the earlier fraud. Amended Complaint ¶¶ 3f and 54.

■ Even if plaintiffs had failed to allege either diligence or concealment, this would not be grounds for dismissal. Plaintiffs are not required to anticipate the statute of limitations defense in their pleadings.

> The equitable tolling doctrine does not come into play, of course, until the defendant has claimed that the plaintiff's cause is time barred. The burden then shifts to the plaintiff to demonstrate that the statute should be tolled.

*Long v. Abbott Mortgage Corp.,* 459 F.Supp. at 113. Ultimate determination of concealment and thus the statute of limitations issue, must await trial.

### C. *Counts 6 through 12*

Plaintiffs' sixth through twelfth causes of action are based on state law claims. Federal equitable tolling principles are not applicable to those causes of action. Connecticut law contains its own principles for tolling statutes of limitations and thus governs as to the tolling of state law claims.[6] Connecticut's tolling provision is set out in Conn.Gen.Stat. § 52–595:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

This tolling provision is applicable to section 36–498(e)'s two-year statute of limitation for securities fraud. In discussing the applicability of section 52–595 to section 36–498's predecessor, then district Judge Newman explained:

> At least for Securities Act violations that sound in fraud, *e.g.,* Conn.Gen.Stat. § 36–338, some tempering of the Securities Act's two-year statute of limitations seems appropriate. Section 36–346(h) provides that civil liability for Securities Act violations are "in addition to rights and remedies that may exist at law or in equity." The application of Connecticut's general civil law tolling statute will not create any cause of action not specified in the Act in contravention of § 36–346(h), but will aid persons injured by the deceptions of those operating in violation of the law in connection with securities transactions.

*Long v. Abbott Mortgage Corp.,* 424 F.Supp. 1095, 1098 n. 2 (D.Conn.1976).

Section 52–595 requires acts of concealment but does not require a pleading of due diligence. Thus, by pleading affirmative acts of concealment, though not due

---

**5.** For a discussion of the rationale of requiring active concealment, but not due diligence, see *Long v. Abbott Mortgage Corp.,* 459 F.Supp. at 118 n. 7:

> concealment—whether affirmative concealment or the nature of the fraud—arguably should be sufficient by itself. Why should it matter whether or not a plaintiff has undertaken a diligent investigation when the concealment insures that such an exercise will be fruitless. If he cannot discover the fraud, the statute should be tolled even if he does not try.

**6.** Both sides agree that the two-year statute of limitations of Conn.Gen.Stat. § 36–498(e) is ap-

plicable to all state claims in the case at bar. This would appear to be the case given the fact that the New York statute, section 352–c, does not specify a statute of limitations. *See Morris Plan Indus. Bank of N.Y. v. Richards,* 42 A.2d 147, 131 Conn. 671 (1945) (generally, law of forum applies to bar of cause of action by statutes of limitations, since such statutes relate to the remedy as distinguished from the right but when cause of action arises under statutes of foreign jurisdiction which not only create liability and remedy but impose limitation thereon as well, then such foreign statute governs).

diligence, plaintiffs have satisfied both the state law requirements of section 52–595 and the federal equitable tolling requirements of the Second Circuit.

### VIII. *Punitive Damages*

Defendants claim that plaintiffs' fourteenth cause of action for punitive damages should be dismissed because punitive damages are not recoverable under either the Connecticut Uniform Securities Act, the New York Securities Laws or RICO. Plaintiffs respond that their punitive damage claim arises under the common law. Neither side cites any support for either proposition.

▇ Under Connecticut law, punitive damages are recognized. *Tedesco v. Maryland Casualty Co.*, 127 Conn. 533, 538, 18 A.2d 357 (1941); *Gagne v. Town of Enfield*, 734 F.2d 902, No. 83–7697, slip op. (2d Cir. May 8, 1984). Such damages are awarded when evidence shows indifference to the rights of others or intentional and wanton violation of those rights. *Vandersluis v. Weil*, 176 Conn. 353, 407 A.2d 982 (1978). Punitive damages awards have specifically been recognized in tort cases. *Collens v. New Canaan Water Co.*, 155 Conn. 477, 488, 234 A.2d 825 (1967).

▇ In this case, plaintiffs have alleged facts which, should they prevail, may entitle them to punitive damages. It should be noted that under Connecticut law, the purpose of punitive damages is to compensate plaintiffs for their injuries; as such, they are limited to plaintiffs' expenses of litigation less taxable costs. *Tedesco v. Maryland Casualty Co.*, 127 Conn. at 538, 18 A.2d 357.

### IX. *Lack of In Personam Jurisdiction*

▇ Defendant John M. Starling has moved to dismiss on grounds of lack of in personam jurisdiction. Starling is alleged to be a Florida resident and engaged in the practice of law in that state. Amended Complaint ¶ 24. Plaintiffs claim that Starling "participated in the scheme at least by drafting or taking part in the drafting of the Prospectus with knowledge that it contained misstatements and misrepresentations." *Id.* at ¶ 81.

Starling claims that this court has no in personam jurisdiction either pursuant to the Connecticut long-arm statute, Conn. Gen.Stat. § 52–59b, or pursuant to the relevant federal statutes, 15 U.S.C. § 77v (pertaining to violations of section 77q) and 15 U.S.C. § 78aa (pertaining to violations of section 78j). If, however, this court determines there to be a basis for federal securities fraud, then it may also exercise jurisdiction with respect to pendent state law claims grounded upon facts identical to those in the federal claims. *Cf. Schwartz v. Eaton*, 264 F.2d 195 (2d Cir.1959); *Murphey v. Hillwood Villa Associates*, 411 F.Supp. 287, 293 (S.D.N.Y.1976). I will therefore turn first to the dispute over the federal securities law claims.

Section 27 (15 U.S.C. § 78aa) of the Exchange Act provides in part:

> The district courts of the United States ... shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

In determining whether jurisdiction exists under section 27, analyses under the

standards of a state statute or under *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) and its progeny are irrelevant. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 n. 9 (2d Cir.1974). As the Second Circuit has explained in construing a New York securities statute:

> Since we hold that Congress meant § 27 to extend personal jurisdiction to the full reach permitted by the due process clause, it is unnecessary to discuss the applicability of the New York statutes, which could reach no further.

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir.1972).

In its construction of section 27, the court in *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 64–65 (S.D.N.Y.1980) explained section 27's

> interpretations by the courts are by now well settled. In a criminal case, a defendant may be proceeded against in any district "wherein any act or transaction constituting the violation occurred." As for a civil action, a defendant may be sued in any district that would be appropriate, under the foregoing test, if the action were criminal in nature—hence the reference to "any such district" in the third sentence of Section 27—or, as an alternative, in a district where the defendant "is found or is an inhabitant or transacts business." To the extent that a civil plaintiff is proceeding under the first of these alternatives, the "test for a civil action is that applicable to a criminal proceeding under the Act," *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 204 (5th Cir.1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

Plaintiffs in this case argue that they may proceed against Starling in Connecticut—a district in which an act constituting a violation occurred. Starling contends that although some sales took place in Connecticut, he played no part in either these or any other violative transactions in Con-

necticut. Plaintiffs, however, need only show that Starling participated in some manner in a scheme which resulted in a violative act or transaction occurring in Connecticut. *Greene v. Emersons Ltd.*, 86 F.R.D. at 65 (court in Southern District of New York had jurisdiction over defendant Illinois corporation whose violative acts took place in Chicago where "[t]he complaint makes a sufficient showing of jurisdiction and venue [by alleging] that 'any act or transaction constituting the violation' occurred in this district, and that [defendant] participated in some manner in the scheme").

Starling argues against jurisdiction on the claim that he had no involvement in the scheme. In his affidavit, Starling denies preparing, taking part in preparing, or advising anyone with regard to any group partnership prospectus. John M. Starling Affidavit, filed March 29, 1984. Plaintiffs have responded with documentary evidence and an affidavit by Mark Harmon, plaintiffs' attorney, linking Starling to the scheme. Affidavit in Opposition to Motion of Defendant Starling to Dismiss for Lack of Jurisdiction, filed April 16, 1984. Plaintiffs principally rely on three pieces of evidence, described in the affidavit as follows:

> Exhibit "A" is a copy of a letter written to Bondy & Schloss by the law firm of Green & Kleinman, which represented Howard Levy and The Davenport Company before it was named as a defendant in the instant action, in which it is stated "[m]y client further advised me that at the time the offering was prepared, the attorney who may have worked on the offering with Jim Johnson was John Starling of Titusville, Florida...". The client to whom Mr. Kleinman refers in said letter is either Davenport or Howard Levy, either of whom would certainly have been in a position to know the identity of the person who drafted the prospectus....
>
> ....
>
> ... Exhibit "B" is a copy of a certified copy of a Deed by which Davenport

obtained ownership of certain land in Florida, which land was supposed to have been purchased on behalf of the Group Partnership. There are four separate deeds for each of the four tracts involved and one of those deeds was to be returned to John Starling. Obviously, his involvement in the purchase of the land raises further serious questions as to his involvement in the transactions which form the basis of this lawsuit.

... Exhibit "C" is a copy of the Summons and Complaint filed by defendant, Merit Management Corporation ("Merit"), which plaintiffs allege is a fraudulent and collusive action intended solely to coerce plaintiffs to pay defendants monies supposedly owed as a result of defendants' fraudulent scheme. The attorney who brought this action on behalf of Merit was John Starling.

Standing alone, these three pieces of evidence may not convince a fact finder that Starling drafted the prospectus or took part in the offer and sale of securities; nevertheless, the documents certainly raise a question of fact as to these matters and thus are sufficient to withstand a motion to dismiss.

### X. *Summary*

Plaintiffs' first and second claims are dismissed. Plaintiffs have 30 days in which to allege with specificity acts which constitute Green & Kleinman's predicate offenses under RICO. All other motions by defendants are denied.

SO ORDERED.